997 So.2d 849 (2008)
William HARRIS and Rozena Harris
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 2007 CA 1566.
Court of Appeal of Louisiana, First Circuit.
November 10, 2008.
*854 Lewis O. Unglesby, Robert M. Marionneaux, Jr., Baton Rouge, Louisiana, for Plaintiff/Appellee, William Harris and Rozena Harris.
James D. "Buddy" Caldwell, Attorney General, Stacey Moak, Special Assistant Attorney General, Christopher W. Stidham, Christopher A. Mason, Baton Rouge, Louisiana, for Defendant/Appellant, State of Louisiana, through the Department of Transportation and Development.
Before GAIDRY, McDONALD, and McCLENDON, JJ.
GAIDRY, J.
The State of Louisiana, through the Louisiana Department of Transportation and Development (DOTD), appeals a judgment on a jury verdict, finding it liable to the plaintiffs, William Harris and Rozena Harris, for damages resulting from their daughter's death in a motor vehicle accident on a state highway. For the following reasons, we amend the judgment, and affirm the judgment as so amended.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
This action arises from a single-vehicle accident that occurred on January 1, 2001, shortly after midnight, on Louisiana Highway 411 near the community of Maringouin in Pointe Coupee Parish. Rickie Celestine was operating a 2000 Chevrolet Monte Carlo automobile, in which his girlfriend, Kimberly Harris, was a passenger. The automobile was owned by the plaintiff, William Harris, Kimberly's father.
Mr. Celestine went to Kimberly's home sometime during the afternoon of December 31, 2000. He and Kimberly decided to take a drive to New Roads, and opted to use Kimberly's new automobile rather than Mr. Celestine's truck. After visiting Mr. Celestine's aunt and various friends at their homes, the couple went to a New Year's Eve party held at the American Legion hall. While there, Mr. Celestine consumed an alcoholic beverage. Intending to return to Kimberly's home before midnight, the couple left the party sometime after 11:00 p.m.
During the return trip, there were snow flurries. Mr. Celestine estimated the automobile's speed while traveling southbound on Louisiana Highway 411 at approximately 40 to 45 miles per hour. In the course of negotiating a right-hand curve on Louisiana Highway 411, located approximately a mile and a half from Kimberly's home, Mr. Celestine felt a "bump." Assuming the automobile had partially left the roadway, he steered the automobile to the left, but it began to slide across the roadway in a counterclockwise direction. The automobile crossed the highway and the opposite northbound shoulder, where the passenger's side struck a pecan tree located about nine feet and four inches from the roadway edge. After striking the tree, the automobile rotated 180 degrees around the tree, and Kimberly was ejected through the rear window and thrown approximately 45 feet away. She sustained fatal injuries as the result of the accident and died at the scene.
The plaintiffs instituted a wrongful death and survival action against DOTD on July 24, 2001. DOTD answered the plaintiffs' petition, denying its liability and alleging third-party fault.[1] This matter was tried before a jury on February 26 to 28, 2007. Following its deliberations, the jury returned a verdict finding DOTD 70% at fault and Mr. Celestine 30% at fault and *855 awarding the plaintiffs $9,680.30 for their daughter's funeral expenses and $1,000,000.00 each for their daughter's wrongful death.
The trial court's judgment based upon the jury verdict was signed on March 9, 2007. In that judgment, the trial court initially decreed that the State of Louisiana was liable for 70% of the total of $2,000,000.00 in general damages, "plus judicial interest on those sums [sic] from the date of judicial demand and all cost [sic] associated therewith." It then reduced each award of general damages to $500,000.00 pursuant to La. R.S. 13:5106, but without corresponding reference to legal interest thereon. The judgment failed to incorporate the jury's award of funeral expenses. DOTD now suspensively appeals.

ASSIGNMENTS OF ERROR
We summarize DOTD's formally designated assignments of error as follows:
(1) The jury committed manifest error by finding DOTD liable to the plaintiffs pursuant to La. R.S. 9:2800;
(2) The jury committed manifest error in its apportionment of fault, by finding DOTD 70% at fault and Rickie Celestine 30% at fault; and
(3) The trial court committed legal error by allowing James R. Clary, Sr. to testify and express opinions in the field of accident reconstruction.
In addition to the foregoing, DOTD in the argument of its appellate brief contends that the trial court committed error in its instructions to the jury on the applicable law and in its jury verdict form. Finally, DOTD challenges the legal validity of the jury's verdict on the grounds that the identity and number of jurors voting on each interrogatory of the verdict form was inconsistent. We construe these as additional assignments of error. See La. C.C.P. art. 2129; Greenfield v. Lykes Bros. S.S. Co., 02-1377, p. 4 n. 2 (La.App. 1st Cir.5/9/03), 848 So.2d 30, 32 n. 2; and Grevemberg v. G.P.A. Strategic Forecasting Group, Inc., 06-0766, pp. 5-6 (La.App. 1st Cir.2/9/07), 959 So.2d 914, 917. Although not formally designated as such, we conclude they are properly before us in this appeal.[2]

DISCUSSION

The Facts of the Accident
Rickie Celestine testified that both he and Kimberly had graduated from high school the year of the accident, and that they had dated for a little over a year. He admitted that he was familiar with Louisiana Highway 411, as it was part of the normal route he took to and from Kimberly's home. He described leaving Kimberly's home in her automobile, which he drove, during the afternoon of December 31, 2000, and visiting his aunt's home and various friends in New Roads before finally arriving at the American Legion hall, where a New Year's Eve party was being hosted by his cousin. While there, Mr. Celestine and Kimberly each had an alcoholic beverage. Mr. Celestine recalled that he drank perhaps half of his drink, which contained about three-quarters of an inch of whiskey in a white plastic cup, and that he took a sip of Kimberly's drink. He specifically denied consuming any other alcoholic beverages that day.
Sometime shortly after 11:00 p.m., the couple decided to leave the party and return to Kimberly's home. After they passed through the community of Livonia, *856 Kimberly spoke to her mother on her cellular telephone. From what Mr. Celestine heard of the conversation, Mrs. Harris inquired as to the couple's location, their activities earlier that night, and whether he was driving fast, and advised them to be careful. Kimberly informed her mother of their location (not far from her home), that Mr. Celestine was "barely doing forty [miles per hour]," and expressed her surprise at the fact that it had started to snow.
According to Mr. Celestine, the couple was not in a hurry to return to Kimberly's home, although they did intend to arrive before midnight. He was surprised to see it snowing during the return trip, as he had never seen snow before, but the snow did not obstruct his vision or otherwise impair his driving. As he rounded a right-hand curve on Highway 411, at a speed of no more than 40 miles per hour, Mr. Celestine felt "a little bump," and realized the automobile had left the roadway to the right. He testified that he did not "yank" the steering wheel, but managed to regain the roadway, at which point the automobile began to spin in a counterclockwise direction. The automobile then struck a tree. Mr. Celestine's next recollection was getting out of the automobile to search for Kimberly after he realized she was no longer within the vehicle. He located her behind the automobile, but she was unresponsive. He then managed to find a telephone and called Mrs. Harris to inform her of the accident and their location (about a mile and half, or three minutes' driving time, from the Harris home). Mr. and Mrs. Harris arrived at the scene shortly thereafter.
After the police arrived at the scene, Mr. Celestine was questioned regarding the circumstances of the accident. He was injured as the result of the accident, and was taken for treatment to Pointe Coupee General Hospital. While there, blood was drawn for purposes of blood alcohol testing. Under questioning by plaintiffs' counsel, he admitted that he was later arrested for driving while intoxicated, but explained that the charge was later dismissed.
Under cross-examination, Mr. Celestine conceded that the charge of driving while intoxicated was dismissed because he completed a pretrial diversion program. While acknowledging that he told the investigating state trooper that the snow might have caused him to lose control of the automobile, Mr. Celestine reiterated his earlier trial testimony that the snow did not affect his driving.
Lieutenant Gerard Clessi testified at trial regarding the law enforcement investigation of the accident. He was a shift lieutenant assigned to Louisiana State Police Troop A, on duty at the time of the accident, and was notified of the accident at approximately 12:05 a.m. Lt. Clessi testified that although he encountered some snow flurries en route to the accident scene, there was no accumulation of snow on the roadway at the scene. When he arrived at the scene about a half-hour after being notified, the investigating state trooper (who actually prepared the official report), another state trooper, and other emergency responders were already present.[3] Kimberly had already been placed in an ambulance, and the investigating state trooper advised Lt. Clessi that she did not survive the collision.
Lieutenant Clessi identified the official state police photographs taken as part of *857 the accident investigation. Based upon his observation of the scene, he concluded that the passenger side of the automobile initially struck the tree. The automobile apparently then rotated rapidly in a clockwise direction. Although there were many tire marks on the roadway, it was difficult to relate them to the involved automobile, as opposed to the emergency responder vehicles on the scene. However, one yaw mark (defined by the witness as a mark caused by a tire sliding sideways to its tread) appeared to lead in the direction of the involved automobile's front right tire.
Lieutenant Clessi assisted the other troopers in taking measurements at the accident scene. The roadway measured 22.7 feet in width from the opposite fog lines. The road surface was described as dry in the accident report, and no defects in the roadway condition were noted. The posted speed limit at the location was 50 miles per hour. Although the report indicated that Mr. Celestine had run off the roadway before the accident, it also reflected that the investigating officer looked for a roadway dropoff, but did not see any. Lieutenant Clessi testified that he did not inspect the roadway north of the accident scene for physical evidence further than the reference point used for measurements (a telephone box located about 360-70 feet from the tree), and did not know if the investigating trooper did so. Lieutenant Clessi confirmed that the driver of a motor vehicle in an accident involving a fatality is routinely tested for alcohol and drugs, and that Mr. Celestine's testing revealed a blood alcohol concentration of .08 grams percent.
Under cross-examination, Lt. Clessi clarified his earlier testimony relating to the yaw mark by explaining that the mark had to have been made by a rear tire, even though it led in the direction of the right front tire, given the automobile's rotation after its passenger's side struck the tree. He also recited the report's account of Mr. Celestine's description of the accident, in which there was no mention of running off the roadway to the right. Rather, Mr. Celestine described the automobile sliding sideways "as if something was pushing it" as it came out of the curve, and he further stated that a "heavy downpour of snow on the road" might have caused him to lose control. As to Mr. Celestine's reported blood alcohol concentration, Lt. Clessi testified that a person under the age of twenty-one with a concentration of .08 percent would be presumed to be intoxicated. He further confirmed that Mr. Celestine's condition was listed in the accident report as the primary factor in causing the accident.
On redirect examination, Lt. Clessi conceded that he did not know the exact time of the accident, nor the time the blood alcohol testing was performed. He further admitted that without additional knowledge as to when Mr. Celestine last consumed alcohol, it could not be determined when his blood alcohol concentration would have peaked, or the concentration at the time of the accident, which could have been either higher or lower than .08 percent.

Construction and Maintenance of the Highway
James R. Clary was called by the plaintiffs as an expert witness in civil engineering, as it related to highway design, maintenance, safety, and signage. He testified that he first inspected the highway condition in early 2001 and later reviewed the construction and maintenance history of its control section 22904, which included the accident location. Over the course of his multiple inspections of the highway, he took measurements of various relevant features, and performed a ball-bank test to measure the "comfort speed" of a motor vehicle negotiating the curves near the *858 accident location. He also reviewed DOTD's plan preparation manual, maintenance manual, and general files, as well as standards promulgated by the American Association of State Highway and Transportation Officials (AASHTO). Finally, in addition to his own onsite investigation, Mr. Clary reviewed the official accident report, the state police photographs, and other photographs of the accident location.
Mr. Clary testified that Louisiana Highway 411 is classified as a rural minor collector roadway. He reviewed the history of the highway's control section 22904, explaining that there were seven projects from 1950 through 2004 involving that control section, which measured 5.36 miles in length. The first, accepted by the state in December 1950, involved the first placement of an asphalt surface on a gravel road. The second, assigned in 1971, proposed the placement of new asphalt on the highway over the entire length of the control section. In November 1975, a third project was assigned to place new asphalt over 5.60 miles including the control section, and the completed project was accepted in April 1977. The fourth project involved only the placement of a flashing signal at a railroad crossing, but the fifth was another placement of new asphalt over the 5.36 miles of the control section, assigned in February 1991, work-ordered in September 1993, and accepted in March 1994. Mr. Clary explained that the fifth project was the last highway project assigned and completed prior to the accident. However, the sixth project was assigned by DOTD in August 2000, over four months prior to the accident, although a work order was not issued until May 2001. That project also involved the placement of a new asphalt surface.
Mr. Clary then reviewed the definitions of highway construction categories set out in DOTD's highway plan preparation manual in effect in 1967. He explained that the first project in 1950 met the defined criteria for a "Category C" reconstruction, in that it was a "complete reconstruction" of the highway along its original alignment, but with the original road not being hard-surfaced. Thus, Mr. Clary felt that the project should have complied with the 1948 road design standards of DOTD's predecessor, the Louisiana Department of Highways, as those standards were the only applicable standards in existence in 1950. Those standards, for a Class IV rural minor collector highway, specified lane widths of ten feet, shoulders of five feet minimum width, a maximum steepness ratio of 3:1 for the foreslope or roadside ditch, and a minimum right-of-way width of 80 feet. He also interpreted the fifth project, assigned in 1991 and work-ordered in 1993, as a "total reconstruction" of the highway over the length of the project, requiring DOTD to reconstruct the highway in accordance with the design standards and AASHTO guidelines in effect at the time that project was approved.
Mr. Clary pointed out that the design plans for the third project, assigned in 1975, showed a typical finished section diagram indicating travel lanes of nine feet in width, with shoulders averaging three feet in width. According to that diagram, the plans simply called for the work to match the existing slope, even if that slope was steeper than the 3:1 maximum steepness of the 1948 road design standards.
The fifth project, assigned in 1991, had design plans for travel lanes of eleven feet in width, with shoulders averaging two feet in width. The shoulder slope was not to be steeper than a 3:1 slope, but only to the point where it met the existing foreslope of the adjacent ditch. Mr. Clary further emphasized the fact that in the fifth project, the existing base of the highway was completely replaced with a soil cement base, *859 eight and a half inches thick, upon which two and a half inches of new asphalt paving was in turn placed. According to Mr. Clary, such construction met the definition of "reconstruction" in DOTD's highway plan preparation manual. The fifth project's plans also contained photographs taken on February 17, 1994 at various locations along the project area, one of which depicted the pecan tree later struck by the Harris automobile.
Mr. Clary also reviewed a document published in 1954 by the American Association of State Highway Officials (AASHO), the predecessor organization of AASHTO, setting out guidelines for geometric design of rural highways. That publication recommended avoiding a "broken-back" arrangement of curves (defined as successive curves in the same direction, separated by a straight tangent of less than 1500 feet), as such an alignment is hazardous because most drivers do not expect successive curves to be in the same direction. Mr. Clary explained that the last two curves encountered by Mr. Celestine immediately before the accident met the criteria of a "broken-back" curve. He also criticized DOTD's failure to widen the pavement in those curves, a recommendation set out in the same AASHO reference with regard to older highways with sharp curves.
Discussing DOTD's maintenance planning manual, Mr. Clary explained that DOTD's maintenance division has a policy of weekly or, more commonly, bi-weekly visual highway inspections by a maintenance specialist, in the course of which items requiring maintenance are to be documented and scheduled by highway number, control section milepost, and maintenance function number. The maintenance functions, or work descriptions, were described in the 1991 maintenance planning manual. Three of those maintenance functions described maintenance and repair of non-paved shoulders, such as those along Highway 411. Function 442 addressed the reshaping of minor general edge ruts of one to two inches, and further specified that low shoulders or edge ruts reaching a three-inch depth should be reshaped on a routine basis. Function 443 also described rutting of three inches in depth as the threshold level for restoration of non-paved shoulders. Functions 442 and 443 emphasized that edge ruts reaching five inches in depth should be assigned "first priority" on the work schedule, and be scheduled "as soon as resources are available, interrupting previously scheduled routine work, if necessary."
Mr. Clary also reviewed the DOTD prescheduling inspection reports of District 61 relating to maintenance of Highway 411 from June through December 2000. In addition to notations for the removal of fallen tree limbs, there were notations for "spot surface replacement" and repair of potholes, but no notations involving shoulder dropoffs, shoulder repair, or other work related to maintenance Functions 442 or 443.
Mr. Clary testified that the highway lanes were ten feet in width, measured from the insides of the fog lines on the edges of the roadway. The pecan tree struck by the Harris automobile was nine feet, three inches from the outer edge of the adjacent fog line of the northbound lane. The ditch foreslope on the northbound side of the highway had a 2:1 slope, and the shoulder width in the vicinity of the tree varied from 1.2 to 1.5 feet in width. Mr. Clary expressed the opinion that the pecan tree was well within DOTD's right-of-way, whether the right-of-way was either 50 or 80 feet wide. Based upon his examination of the closeup photographs depicting the highway edge dropoff, he estimated the depth of the dropoff to be approximately five inches, *860 warranting expedited repair of that problem.
Mr. Clary attributed the occurrence of the accident and Kimberly's death to a number of factors related to the design and maintenance of the highway. He emphasized that the tree struck by the automobile was situated too close to the travel lane, and that there was no evidence of appropriate curve warning signs in place at the time of the accident. He also expressed the opinion that if the automobile left the roadway at the location indicated by Mr. Celestine in his testimony, Mr. Celestine would have had difficulty regaining the roadway due to the dropoffs severity, and in doing so, steering the automobile to the left, he would have initiated the automobile's counterclockwise spin. The narrowness of the shoulders and the steepness of the ditch foreslopes also contributed to the accident, according to Mr. Clary, in that they inhibited recovery after the vehicle left the roadway.
Under cross-examination, Mr. Clary conceded that his documentation of the dropoffs location was based upon photographs taken by the plaintiffs' attorney on March 25, 2001, although he personally observed the dropoff before work began on the sixth project on the highway in 2001. Reviewing the closeup photographs of the dropoff taken that day, he agreed that the dropoff edge was more angled than vertical, thereby reducing the amount of "scrubbing" or rubbing resistance of a tire of a vehicle attempting to regain the roadway. He reiterated his opinion that the automobile's encounter with the edge dropoff or rut led to the loss of control and spin after it regained the roadway, explaining that its movement upon reentering the roadway was "typical of a drop-off reentry in a counter-clockwise position."
Mr. Clary disagreed with a suggestion that the 1950 project simply constituted a "betterment" of the highway surface, as opposed to a substantial reconstruction requiring adherence to the 1948 design standards. He did concede that the third project, accepted in 1977, was only an overlay, but reiterated his conclusion that the fifth project, accepted in 1994, was a "reconstruction," according to DOTD's highway plan preparation manual in effect from 1967 through that time, and according to a 1977 AASHTO geometric design guide for highway "resurfacing, restoration, and rehabilitation" ("3R"). While admitting that later AASHTO publications, published prior to 1991, seemed to characterize reworking of the base of a highway as "3R" rather than reconstruction, Mr. Clary emphasized that DOTD had not correspondingly changed its definitions relating to reconstruction in its highway plan preparation manual.
Ronnie Robinson was DOTD's district design, water resources and development engineer for the highway district at issue, District 61, and was called to testify as an adverse witness by the plaintiffs. He explained that the preparation of prescheduling inspection reports was handled by DOTD's maintenance section, rather than the design section to which he was assigned. He also explained the district design office is only responsible for overlays of existing highways, rather than design of new highways, and that his responsibilities were limited to those of his district design office. He acknowledged that there were different types of overlays, varying from a minor overlay of one inch of asphalt to improvement including the base of the roadway. Mr. Robinson testified that DOTD's overlay programs usually involved work within only the crown width of roadways, or from the edge of one shoulder to the edge of the opposite shoulder, based upon economic considerations. With regard to the apparent highway right-of-way *861 for Louisiana Highway 411, Mr. Robinson acknowledged that one DOTD project document shown to him listed an apparent right-of-way of 50 feet. He explained, however, that such an apparent width of right-of-way would not necessarily be uniform throughout the entire length of a project.
Recalled to testify during DOTD's presentation of testimony, Mr. Robinson reviewed DOTD's records relating to the highway's construction history, including the 1950 project. He explained that the actual project documents characterized that project as a "betterment" project, improving the original rural gravel road to a bituminous hard surface road, using the original gravel to help to build up the base for the new surface. He further explained that although the second project was assigned in 1971, it was never funded and not undertaken. The third project, work-ordered in 1976, did not involve any change to the existing base or surface, but only the placement of a new asphalted surface over the old surface, with some shoulder work.
Mr. Robinson testified that the fifth project, work-ordered in 1993, involved an initial analysis of the functioning of the highway, as the result of which it was determined that there was no need for reconstruction or new alignment for the section involved in the project. Because the soil borings revealed that the surfaces placed during the third and first projects were relatively intact beneath the outer surface exposed to the elements, it was decided to simply "cold plane" or mill the upper two inches of the existing surface, reducing it to gravel, then stabilizing that with cement, over which three and a half inches of asphalt were placed. Mr. Robinson also explained that DOTD's actual right-of-way for Highway 411 was not documented by right-of-way maps prepared by licensed surveyors. Rather, as of 1976, DOTD considered its right-of-way to extend a foot and a half past the back of the roadside ditch.
Under cross-examination, Mr. Robinson conceded that if a tree is located within DOTD's right-of-way, DOTD has the authority to remove it. As to the required width of right-of-way under the 1948 road design standards, he explained that the 80 feet standard for Class IV highways applied with regard to new rural highways. Questioned regarding the width of the highway shoulder, Mr. Robinson testified that the as-built plans for the fifth project confirmed that in 1994, when the project was accepted, the shoulder averaged three feet in width. He explained that erosion could account for the decrease in the shoulder's average width to two feet by the time of the sixth project completed in 2001. He characterized both of those projects as overlays, as opposed to reconstruction.
Joseph D. Blaschke, Ph.D., was called by DOTD to testify as an expert witness in the fields of highway design, traffic engineering, and accident reconstruction. He testified that he reviewed the accident report, the state police's accident scene photographs, the other photographs depicting the accident location, and various discovery depositions, and attended Mr. Clary's discovery deposition. He also conducted a site inspection on January 27, 2005, taking relevant measurements from which he prepared a diagram, with the understanding that the highway had been overlaid since the accident.
Dr. Blaschke pointed out that there was no evidence that Mr. Celestine failed to negotiate the second curve he encountered before the occurrence of the accident. Rather, based upon his testimony, Mr. Celestine obviously completed the curve before oversteering to the shoulder. Dr. Blaschke agreed with Mr. Clary's characterization *862 of the sequence of two curves at issue as a "broken back" curve, but emphasized that the straight tangent separating the curves was 600 feet in length, and that Mr. Celestine was admittedly familiar with the location. Thus, Dr. Blaschke considered the "broken back" curve as irrelevant in terms of causation of the accident.
With regard to the highway edge dropoff, Dr. Blaschke emphasized that the 2001 closeup photographs showed the measuring tape at a slope, rather than perpendicular to the ground. While acknowledging the difficulty of discerning the vertical height of the dropoff from the photographs, he concluded that the dropoff shown was obviously less than five inches and probably two to three inches. He explained that given that depth estimate and the slanted shape of the dropoff, the dropoff would not have presented an operational obstacle to a driver attempting to regain the roadway from the shoulder. In that regard, he cited a report documenting research on the relative degrees of safety when vehicles encountered edge dropoffs of various shapes and depths. He explained that the report corroborated his conclusion that the edge dropoff at issue was not unreasonably dangerous, given its shape and depth. Dr. Blaschke conceded that based upon the lack of physical evidence, he could neither affirm nor refute Mr. Celestine's claim that the automobile ran off the highway to the right. He admitted that the "bump" described by Mr. Celestine in his testimony may have been due to the edge dropoff.
Discussing the AASHTO guidelines and their relationship to DOTD's duties, Dr. Blaschke explained that AASHTO is not "authoritative," but rather publishes guidelines, which in turn are recognized by the Federal Highway Administration for purposes of funding road improvements. He emphasized that Louisiana Highway 411 was already in existence when it was brought within the state highway system in 1930, so it was not a newly designed roadway at that point. From that point, the highway gradually evolved into its present form. Dr. Blaschke explained that the term "reconstruction" in terms of highway work has had different meanings over the years, primarily due to changes in federal highway funding procedures. The original definition of "reconstruction" was eventually categorized with the "3R" programs of resurfacing, restoration, and rehabilitation around 1983, and called the "4R" programs. After 1984, AASHTO did not consider that type of reconstruction, however, to be "major reconstruction," whereby an existing highway would be improved to current standards for new roadways. Reviewing the project history for Highway 411, Dr. Blaschke concluded that none of the projects could properly be considered major reconstructions, although the first project in 1950 met some of the criteria for the earlier definition of reconstruction, short of major reconstruction.
With regard to the tree struck by the Harris automobile, Dr. Blaschke expressed the opinion that it was not in a "vulnerable" position requiring its removal, considering the fact that it was located beyond the second curve and the fact that numerous other trees were similarly located along that rural highway. Dr. Blaschke agreed with the conclusion that the automobile was rotating counterclockwise before it struck the tree, and with the conclusion that the rotation was initiated by the automobile being steered to the left, rather than due to the design of the curve, but explained that the reason for the steering could not be determined from the available evidence.

ANALYSIS
Louisiana Civil Code articles 2315 and 2316 are the codal foundation for delictual *863 liability for negligence in our state. Louisiana Civil Code articles 2317 and 2317.1 define the basis for delictual liability for defective things. Article 2317.1 provides that the owner or legal custodian of a defective thing causing injury or damage is liable "only upon a showing that he knew or, in the exercise of reasonable care, should have known of [the defect], that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." Louisiana Revised Statutes 9:2800 further circumscribes the liability of public entities, including DOTD, under La. C.C. arts. 2317 and 2317.1. At the time of the accident at issue,[4] it provided, in pertinent part:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.
The reported cases dealing with DOTD's duties toward motorists in the design, construction, and maintenance of state highways are often difficult to reconcile in terms of their ultimate results, despite general consistency in their description of the basis and scope of those duties. Even the decisions of our supreme court in that regard must be carefully analyzed in order to find some consistency therein. Ultimately, the only constant in the line of jurisprudence dealing with DOTD's liability to the public for the condition of state highways is that its liability "depends on all the facts and circumstances determined on a case by case basis." Netecke v. State ex. rel DOTD, 98-1182, 98-1197, pp. 8-9 (La. 10/19/99), 747 So.2d 489, 495.
DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Toston v. Pardon, 03-1747, p. 10 (La.4/23/04), 874 So.2d 791, 799. DOTD must also maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Netecke, 98-1182 at p. 8, 747 So.2d at 495. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. Law v. State ex rel. Dep't of Transp. and Dev., 03-1925, p. 5 (La.App. 1st Cir.11/17/04), 909 So.2d 1000, 1004, writs denied, 04-3154, 04-3224 (La.4/29/05), 901 So.2d 1062. The duty to maintain highway shoulders in a reasonably safe condition, however, does not render DOTD the guarantor of the safety of all the motoring public. Lasyone v. Kansas City S.R.R., 00-2628, p. 8 (La.4/3/01), 786 So.2d 682, 690. (Emphasis supplied.)
*864 In the case of Graves v. Page, 96-2201, p. 18 (La.11/7/97), 703 So.2d 566, 574, the supreme court concluded that "[i]t is unreasonable to impose a rule of law that would require DOTD to maintain every tree and shrubbery within its control or face the prospect of tort liability." However, that case involved vegetation and undergrowth in the ditch and ditch bank of the highway right-of-way, creating a sight obstruction, rather than a physical obstruction or danger, and the court expressly observed that "cases involving foliage are determined on a factual case-by-case basis." Id., 96-2201 at p. 14, 703 So.2d at 572.
DOTD's responsibility to provide minimum safety standards with respect to highway design, construction, and maintenance is set out in La. R.S. 48:35, originally enacted in 1968, which provides, in pertinent part:
A. The Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [AASHTO]. Hereafter, the state highway system shall conform to such safety standards. . . .
B. The chief engineer may designate highways within the state highway system for reconstruction or repair at standards which are less than those as approved by the American Association of State Highway and Transportation Officials [AASHTO]; however, no reconstruction or repair shall be done on any highway under this Part which results in a pavement width of less than eighteen feet, and all reconstruction or repair done under this Part shall be accomplished within the existing right-of-way.
. . .
F. (l)(a) The state, the Department of Transportation and Development, . . . has a duty to maintain, repair, construct, or reconstruct any public . . . highway, . . . or any portion thereof, in a manner that is not unreasonably dangerous for a reasonably prudent driver.

(b) When any public . . . highway, . . . or any portion thereof, is maintained, repaired, constructed, or reconstructed in accordance with the standards, regulations, or guidelines in effect on the date of approval by the chief engineer,. . . of the original or amended design for the construction or major reconstruction, whichever is later, of such public . . . highway, . . . or any portion thereof, there shall be a presumption that any such public . . . highway, . . . or any portion thereof, is maintained, repaired, constructed, or reconstructed in a reasonably safe condition.
(c) When any public . . . highway,. . . or any portion thereof, does not conform to one or more standards, regulations, or guidelines established or adopted subsequent to the date of such approval of the original or amended design plan for the construction or major reconstruction, whichever is later, of any such public . . . highway, . . . or any portion thereof, such nonconformity shall not render any such public . . . highway, . . . or any portion thereof unreasonably dangerous or defective.

(2) When determining whether or not an unreasonably dangerous condition exists under this Paragraph, if a standard, regulation, or guideline is not directly applicable to the maintenance, repair, construction, or reconstruction, then evidence of failure to adhere to such standard, regulation, or guideline *865 shall not be admissible in a court proceeding for any purpose. (Emphasis supplied.)
DOTD has no duty to bring old highways up to modern AASHTO standards, unless a new construction or major reconstruction of the highway has taken place. Toston, 03-1747 at p. 10, 874 So.2d at 799. (Emphasis supplied.) In 1999, the cited statute was amended to legislatively overrule Aucoin v. State through Dep't of Transp. & Dev., 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62, which permitted consideration of post-construction highway safety standards or guidelines in determining DOTD's liability. See Acts 1999, No. 1223, §§ 2 and 3. Thus, for cases arising after July 9, 1999 (the effective date of the amendments), the "evidence of failure to adhere to [a post-construction] standard, regulation, or guideline shall not be admissible in a court proceeding for any purpose." La. R.S. 48:35 F(2); Temple v. State ex rel. Dep't of Transp. & Dev., 02-1977, p. 7 n. 1 (La.App. 1st Cir.6/27/03), 858 So.2d 569, 576 n. 1, writ denied, 03-2116 (La.11/7/03), 857 So.2d 501. For a standard or guideline to be "directly applicable" and admissible for the purpose of determining the existence of an unreasonably dangerous condition, it must have been adopted prior to the date of approval of the original or amended design plan for the last construction or major reconstruction of the roadway. See La. R.S. 48:35(F)(l)(b) and (c); Hager v. State, ex rel. Dep't of Transp. & Dev., 06-1557, pp. 15-16 (La.App. 1st Cir.1/16/08), 978 So.2d 454, 465-66, writs denied, 08-0347, 08-0385 (La.4/18/08), 978 So.2d 349.
While failure to adhere to AASHTO standards may not in itself attach liability, whether DOTD has conformed to the applicable AASHTO standards is a relevant factor in determining the ultimate issue of whether the highway is unreasonably dangerous. See Aucoin, 97-1938 at p. 7, 712 So.2d at 66. And even when DOTD is not required to improve a highway to current AASHTO standards, it has a duty to correct unreasonably dangerous conditions existing on old highways. Temple, 02-1977 at p. 7, 858 So.2d at 576. Additionally, while design standards may be relevant factors in deciding whether a roadway presents an unreasonable risk of harm, standards alone are not determinative. Charon v. Bowman, 06-0882, p. 10 (La.App. 1st Cir.8/1/07), 965 So.2d 466, 473, writ denied, 07-1773 (La.11/9/07), 967 So.2d 505.
The issue of whether a highway project constitutes a major reconstruction of the highway is a factual issue, rather than a legal issue, although it determines the scope of the legal duty imposed upon DOTD in terms of compliance with applicable design standards. Our review of the evidence on this point reveals significant factual dispute as to whether the fifth project, accepted in 1994, was an overlay or rehabilitation, a reconstruction, or a major reconstruction. See, e.g., Hager, 06-1557 at p. 16, n. 6, 978 So.2d at 466 n. 6. Unlike the cited case, the record here contains no evidence of a concise definition of "major reconstruction" readily applicable to the factual circumstances. Thus, the jury may legitimately have concluded that the fifth project constituted a major reconstruction of the highway.
While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to discover that which is easily discoverable. Brown v. La. Indem. Co., 97-1344, p. 8 (La.3/4/98), 707 So.2d 1240, 1244. The circumstantial evidence and testimony in the record supports the jury's implicit conclusion that the highway edge dropoff depicted in the photographs of March 25, *866 2001 existed on the date of the accident, that DOTD failed to discover it despite its ongoing biweekly inspections of the highway, and that the dropoff was a contributing factor in Mr. Celestine's loss of control of the Harris automobile. As noted by the court in Everhardt v. La. Dep't of Transp. & Dev., 07-0981, p. 19 (La.App. 4th Cir.2/20/08), 978 So.2d 1036, 1050, "Louisiana jurisprudence is replete with cases holding that a drop-off from the roadway to the shoulder in excess of four inches constitutes a defect in the roadway and presents an unreasonable risk of harm to the traveling public." Similarly, the record contains sufficient evidence upon which the jury may have concluded that the pecan tree was in DOTD's right-of-way and posed an unreasonably dangerous condition due to its proximity to the roadway.[5] Such findings would support DOTD's liability, even absent a finding of major reconstruction and its attendant imposition of DOTD's corresponding duties.
It is well settled in Louisiana that the trier of fact is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. Williams v. Rubicon, Inc., 01-0074, p. 5 (La.App. 1st Cir.2/15/02), 808 So.2d 852, 858. The trier of fact may accept or reject in whole or in part the opinion expressed by an expert. Wade v. Teachers' Ret. Sys. of La., 05-1590, p. 8 (La.App. 1st Cir.6/9/06), 938 So.2d 103, 108, writ denied, 06-2024 (La.11/3/06), 940 So.2d 673. Here, the opposing parties presented expert testimony suggestive of diametrically different conclusions. The jury evidently found Mr. Clary's testimony to be more convincing or credible in light of the other evidence presented. Although this court as trier of fact might possibly have interpreted the evidence in a different fashion, we cannot conclude that the jury's finding of fault on DOTD's part constituted manifest error on the showing made.
In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the supreme court articulated the factors appropriate for consideration in allocating fault between two or more parties:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
The allocation of comparative fault between joint tortfeasors is a factual determination, and the trier of fact's allocation is therefore owed deference. Snearl v. Mercer, 99-1738, p. 27 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 584, writs denied, *867 01-1319, 01-1320 (La.6/22/01), 794 So.2d 800,801.
A finding of intoxication alone does not preclude a finding of fault on the part of DOTD for failure to maintain or upgrade a highway shoulder or ditch foreslope. Petre v. State ex. rel. Dep't of Trans. and Dev., 01-0876, p. 12 (La.4/3/02), 817 So.2d 1107, 1114. Rather, a driver's "unacceptable and illegal actions in driving while intoxicated" should simply be "weighed heavily against [him] in considering the extent of DOTD's duty to [him]," being "merely a factor to consider in Louisiana's comparative negligence scheme." Id. In Petre, the accident occurred in a curve. The plaintiff driver, who was intoxicated, had directed her attention to another vehicle in the opposite lane, and inadvertently allowed the right side wheels of her vehicle to leave the paved surface. She testified that she attempted to regain the highway, but crossed a shoulder having only one and one-half feet of usable surface area and traveled along a ditch before striking a culvert and driveway. The investigating state trooper found no marks on the surface of the roadway and concluded that the vehicle was still under the driver's control when it left the highway. The ditch had a slope varying from 3:1 to 4:1. The plaintiffs expert testified that even a sober motorist would not have been able to recover and reenter the road under those circumstances. Further, the trial court specifically found, based upon the same expert's testimony, that the defective curvature of the highway and the absence of chevrons delineating the curve were substantial factors in causing the accident. In terms of ultimate causative effect, the cumulative effect of the defective conditions contributed to the sequence of events culminating in the final, fatal impact in which the driver's daughter was killed. Thus, even though the plaintiff driver's intoxication was a "major cause of the accident," the supreme court concluded that DOTD could still be held 50% liable for the plaintiffs damages. Id., 01-0876 at p. 1, 817 So.2d at 1108.
At the time the accident at issue occurred, La. R.S. 32:662(A)(1)(d) established a legal presumption of intoxication as to a person under the age of twenty-one having a blood alcohol concentration of .02 percent or more by weight at the time of the alleged offense. However, that presumption was inapplicable to civil actions. La. R.S. 32:662(C). There was no corresponding statute establishing such a presumption in civil cases. A blood alcohol concentration level must be interpreted by competent expert testimony in order for a trier of fact to determine its effect on a person's ability to operate a vehicle. Pereira Enterprises, Inc. v. Soileau, 551 So.2d 39, 41 (La.App. 1st Cir.1989). DOTD did not present any expert testimony regarding the degree of Mr. Celestine's intoxication or impairment based upon the results of his blood alcohol testing. A trier of fact cannot extrapolate a conclusion as to a driver's intoxication based upon a bare numerical test result, standing alone, nor may a court properly take judicial notice of toxicological standards in a legal context such as this.
The jury heard the testimony of Mr. Celestine, admitted without objection by either side, describing the nature of his consumption of alcohol that night and the disposition of the charge of driving while intoxicated. It also heard the testimony of Mr. Harris, Kimberly's father, who testified that he spoke to Mr. Celestine at the scene of the accident and did not smell alcohol on his person. Based upon its credibility determinations, the jury in its considered discretion apportioned 30% of the fault for the accident to Mr. Celestine, and 70% of the fault to DOTD. We cannot *868 conclude it was manifestly erroneous in doing so, given the facts before us. See, e.g., Hanchett v. State, ex rel. Dep't of Transp. & Dev., 06-1678, pp. 9-10 (La. App. 1st 11/7/07), 977 So.2d 78, 83-4.

Admission of Expert Testimony as to Cause of the Accident
DOTD contends that the trial court erred in permitting Mr. Clary to present expert testimony relating to the field of accident reconstruction, rather than limiting his testimony to the fields of expertise within which he was accepted by the court. But DOTD does not dispute the fact that no contemporaneous objection was made to such testimony at trial, nor was a pretrial motion in limine filed for the purpose of limiting such testimony.
The factual basis for an expert opinion determines the credibility of the testimony. It is the responsibility of the opposing party to explore the factual basis for the opinion and thus determine its reliability, Leard v. Schenker, 06-1116, p. 3 (La.App. 1st Cir.6/16/06), 931 So.2d 355, 357, citing Miramon v. Bradley, 96-1872, p. 6 (La.App. 1st Cir.9/23/97), 701 So.2d 475, 478. Thus, the failure to raise an objection to the admissibility and reliability of expert testimony constitutes a waiver of such an objection. La. C.E. art. 103(A)(1); Everhardt v. La. Dep't of Transp. & Dev., 07-0981, p. 11 (La.App. 4th Cir.2/20/08), 978 So.2d 1036, 1046. A contemporaneous objection to the disputed evidence must be entered on the trial record in order to preserve the objection for appellate review. Furthermore, when the objecting party fails to request an evidentiary "gatekeeping" hearing under the rationale of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), his objections to the admissibility of an expert witness's testimony under Daubert are not preserved for appeal. Brown v. Schwegmann, 05-0830, pp. 5-6 (La.App. 4th Cir.4/25/07), 958 So.2d 721, 724, writ denied, 07-1094 (La.9/21/07), 964 So.2d 333. This assignment of error has no merit.

The Jury Instructions
DOTD contends that the trial court erred in failing to adequately instruct the jury as to Mr. Celestine's legal duty as the driver of a motor vehicle, and that its repeated recitation of portions of its instruction relating to DOTD's duties served to overemphasize that issue to the jury.
It is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions, and that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023. Initially, we note that no express objection was made by DOTD to the inclusion or exclusion of any requested instruction during the trial court's charge conference with counsel. More importantly, however, our review of the trial court's instructions shows that the trial court did indeed address the general duties of a motorist, particularly those of a motorist inadvertently leaving the travel lane of a roadway, and that any repetition of instructions was not so pronounced as to rise to error that may have unduly influenced the jury. We likewise find no error in the composition of the special interrogatories and verdict form. This assignment of error has no merit.

Internal Inconsistency of Jury Verdict
Louisiana Code of Civil Procedure article 1797(B) provides that "[i]f trial is by a jury of twelve, nine of the jurors must concur to render a verdict unless the parties *869 stipulate otherwise." The article is silent on the question of consistency of identity of the jurors on each related issue upon which a vote is taken.
DOTD challenges the legality of the jury verdict upon which the trial court's judgment was entered, based upon the following circumstances. After it returned its verdict, the jury was polled as to the votes on each special interrogatory on the verdict form. The vote was 9-3 on the first two interrogatories relating to whether the highway was defective and whether the defect was a cause of the accident, with the same three jurors voting "no" on each interrogatory. However, two of those three dissenting jurors later voted with a 10-2 majority in favor of apportioning 70% of the fault to DOTD, while only one voted against that apportionment, joined by one member of the original 9-3 majority. DOTD contends that the votes of the two original dissenting jurors who later voted to assess DOTD with 70% of the fault were inconsistent with their original votes on the issues of existence of a defect and legal causation, and therefore should not be considered. Doing so would leave an 8-2 vote on apportionment of fault, which DOTD contends would require a de novo review and reassessment of percentages of fault by this court.
This precise issue appears to be undecided in our jurisprudence. See Patricia E. Weeks, Have They Decided or Have They Not Decided? That is the Question, 50 La.B.J. 430, 432 (2003). However, a similar issue arose in the case of Bertrand v. Aetna Cas. & Sur. Co., 306 So.2d 343 (La.App. 3rd Cir.), writ denied, 310 So.2d 641 (La.1975). The jury in that medical malpractice action returned a verdict in favor of four defendant health care providers. Its votes on the liability of two defendants were 9-3, with the same three jurors dissenting. Its votes as to the other two defendants were 10-2, but with two different jurors in the minority on each of those votes. Of the twelve jurors, eight voted to find no liability on the part of any defendant; the plaintiff therefore argued that the overall verdict did not comply with the law and that the trial court should have granted a new trial. In concluding that the verdict complied with the codal requirement, the court observed:
Nine jurors answered no to each of the required questions. No alternate question was posed to the jury for the eventuality that should nine agree that each defendant was free from negligence, then the jury would still have to obtain nine votes holding that all defendants were free from negligence.
Id. at 347. At least one doctrinal authority has cited Bertand's holding for the proposition that "[w]hen the requisite number of jurors agree that the plaintiff may not recover or that the plaintiff should recover a certain amount, it is immaterial that the same jurors do not agree on the theory of recovery or defense." 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 11.11 (1999).
In other jurisdictions, two predominant but opposing lines of authority have developed regarding the issue at hand: the "same juror rule" and the "any majority rule." Hendrix v. Docusort, Inc., 18 Kan. App.2d 806, 809, 860 P.2d 62, 65 (Kan.App. 1993); Weeks, supra, at 431. Under the "same juror rule," the same jurors must form the majority on each interrogatory in order for a verdict to be valid. Hendrix, 18 Kan.App.2d at 809, 860 P.2d at 65. Under the "any majority rule," any nine jurors agreeing on any interrogatory is sufficient to support the overall verdict. Weeks, supra.
The line of authority adopting the "same juror rule" is best represented by the case *870 of O'Connell v. Chesapeake & Ohio R.R. Co., 58 Ohio St.3d 226, 569 N.E.2d 889 (Ohio 1991). In that case, the Ohio Supreme Court explained the rationale of the "same juror rule":
[T]he major principle behind the "same juror" rule is that the determination as to whether a party is causally negligent is not independent from, but indeed is inseparable from, the apportionment of negligence. Stated otherwise, a juror's finding as to whether liability exists is so conceptually and logically connected with apportioning fault that inconsistent answers to the two questions render that juror's vote unreliable and thus invalid.
O'Connell, 58 Ohio St.3d at 233, 569 N.E.2d at 896.
In the case of Juarez v. Super. Ct. of L.A. County, 31 Cal.3d 759, 765-66, 183 Cal.Rptr. 852, 647 P.2d 128, 131-32 (1982), the California Supreme Court was also confronted with the same procedural issue as here: "[w]hether nine identical jurors must agree both on the determination of liability and on the apportionment of damages." In rejecting the considerations supporting the "same juror rule," the court observed:
Absent evidence to the contrary, we cannot assume that a juror will ignore his sworn duties. "It is more proper to assume that when a juror is outvoted on an issue (liability) he will accept the outcome and continue to deliberate with other jurors honestly and conscientiously to decide the remaining issues." (Citations omitted.)
Juarez, 31 Cal.3d at 768, 183 Cal.Rptr. 852, 647 P.2d at 133. The court also concluded:
To hold otherwise would be to prohibit jurors who dissent on the question of a party's liability from participation in the important remaining issue of allocating responsibility among the parties, a result that would deny all parties the right to a jury of 12 persons deliberating on all issues.
Id.
The court in Schabe v. Hampton Bays Union Free Sch. Dist, 103 A.D.2d 418, 424, 480 N.Y.S.2d 328, 333 (1984), also endorsed the "any majority rule," citing reasons similar to those of Juarez:
The [same juror] concept tends to alter a fundamental premise of the jury systemthat all members of a jury panel partake meaningfully in disposition of the case. Under the [same juror] principle, the casting of a dissenting vote on any question reduces the dissenter's influence to a state of practical impotence and creates a mandate for continued unanimity among the other jurors on the remaining questions if the verdict is to survive. The dissenter is then bereft of real voting power, for his vote on the remaining questions can no longer affect the verdict.
In considering this issue, we are also guided by the factors underlying the principle that "quotient verdicts" by juries are disfavored. As explained in Ritchey v. Dees, 540 So.2d 1265, 1269 (La.App. 3rd Cir.), writ denied, 542 So.2d 1387 (La. 1989):
A quotient verdict is a verdict in which the jurors agree to total each juror's proposed damage award, divide this sum by twelve, and be bound by the average. Quotient verdicts are not favored in Louisiana because they preclude full deliberation on the issues and cause abandonment by some or all jurors of their conscientious convictions on material issues. (Citation omitted.)
Our jurisprudence's recognized policy considerations against "quotient verdicts" clearly are more in accord with *871 those underlying the "any majority rule" than those underlying the "same juror rule." Considering the foregoing, and carefully weighing the policy considerations on the opposite sides of the issue, we conclude that the sounder position is that of the "any majority" rule. Accordingly, we hold that the jury's verdict was legally and procedurally valid, and that DOTD's assignment of error on this issue has no merit.

Amendment of the Judgment
The trial court's final judgment based upon the jury verdict contains a number of obvious errors.[6] Initially, it purports to assess "judicial [legal] interest . . . from the date of judicial demand" against the state on the principal amount of $1,400,000.00, representing 70% of the total general damages of $2,000,000.00 awarded. It then reduces the individual general damages awards to the plaintiffs to $500,000.00 each in accordance with La. R.S. 13:5106, but without any corresponding mention of legal interest. As presently worded, the judgment would seem to cast the state in judgment for legal interest on an additional $400,000.00 over the statutory cap on its liability. Additionally, the judgment as worded is contrary to the express language of La. R.S. 13:5112(C), relating to suits against the state and its departments, which provides:
Legal interest on any claim for . . . wrongful death shall accrue at six percent per annum from the date service is requested following judicial demand until the judgment is signed by the trial judge in accordance with Code of Civil Procedure Article 1911. Legal interest accruing subsequent to the signing of the judgment shall be at the rate fixed by R.S. 9:3500.
Finally, the trial court's judgment fails to account for the jury's award of special damages for funeral expenses, and likewise fails to reduce that award against the state to 70% of the total amount of such damages.
Although the parties have not raised those errors as issues on appeal or otherwise addressed them, this court has a statutory mandate to render a judgment "which is just, legal, and proper upon the record on appeal." La. C.C.P. art. 2164. The purpose of article 2164 is to give the appellate courts "complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below." Comment (a), La. C.C.P. art. 2164; Vallejo Enter., L.L.C. v. Boulder Image, Inc., 05-2649, p. 8 (La.App. 1st Cir.11/3/06), 950 So.2d 832, 838. We consider it necessary and appropriate to correct those errors to conform the judgment to the law and to do justice to the parties. Accordingly, we amend the trial court's judgment to delete the decretal language providing that "the State of Louisiana is hereby cast for SEVENTY PERCENT (70%) of the TWO MILLION ($2,000,000.00) DOLLARS plus judicial interest on those sums [sic] from the date of judicial demand and all cost [sic] associated therewith." We further amend the judgment to provide as follows:
Considering the verdict of the jury and the findings of fault and damages expressed therein,
IT IS ORDERED, ADJUDGED AND DECREED that, in accordance with the jury's verdict and La. R.S. 13:5106, judgment is rendered in favor of the plaintiff, William Harris, for the sum of FIVE HUNDRED THREE *872 THOUSAND THREE HUNDRED EIGHTY-EIGHT AND 11/100 DOLLARS ($503,388.11) and in favor of the plaintiff, Rozena Harris, for the sum of FIVE HUNDRED THREE THOUSAND THREE HUNDRED EIGHTY-EIGHT AND 11/100 DOLLARS ($503,388.11) and against the State of Louisiana, together with legal interest thereon as provided in La. R.S. 13:5112(C) and all court costs authorized by La. R.S. 13:5112(A).
As amended above, the judgment of the trial court is affirmed. All costs of this appeal, amounting to $10,139.00, are assessed to the defendant, the State of Louisiana, through the Department of Transportation and Development.
AMENDED AND, AS AMENDED, AFFIRMED.
McDONALD, J., concurs and assigns reasons.
McCLENDON, J., concurs and assigns reasons.
McDONALD, J., concurs and assigns reasons.
I agree with the reasons assigned by Judge McClendon in her concurrence. In particular, I believe the proximate cause of this accident, as found by the jury, was the defect in the shoulder of the roadway. I do not believe it is necessary to address the pecan tree at all. Had this been a culvert from a driveway entering the highway rather than a tree, the result would have been the same. I am not prepared to require DOTD to remove all trees from rights of way along all the state highways in this state.
McCLENDON, J., concurs and assigns reasons.
Although I would normally have found the jury erred in not allocating a much higher degree of fault to the driver, I must agree with the majority that the evidence presented was insufficient to establish the degree of intoxication or impairment of Mr. Celestine. Thus, I am constrained to agree with the jury's apportionment of only 30% of the fault to Mr. Celestine. Further, because the jury could have reasonably found based on credibility determinations that the drop-off from the roadway to the shoulder presented an unreasonable risk of harm, I believe that it was unnecessary to address whether the pecan tree, on the opposite side of the roadway and in DOTD's right-of-way, posed an unreasonably dangerous condition. Therefore, I respectfully concur.
NOTES
[1] The plaintiffs did not name Mr. Celestine as a defendant.
[2] Plaintiffs evidently reached the same conclusion, as they fully responded to each additional assignment of error in their brief to this court.
[3] The investigating state trooper was no longer employed by the Office of State Police at the time of trial, and did not testify.
[4] The statute has since been amended by Acts 2003, Nos. 725 and 1007. and Acts 2006, No. 545, § 1.
[5] Cf. Updegraff v. State ex rel. Dep't of Transp. & Dev., 01-1048, pp. 12-13 (La.App. 4th Cir. 10/2/02), 828 So.2d 693, 702-03, writs denied, 02-2909, 02-2916 (La.2/7/03), 836 So.2d 103, 105, and Hager, 06-1557 at p. 22, 978 So.2d at 469.
[6] We note that the judgment was evidently prepared by counsel for one or both sides of the litigation, and then submitted to the trial court for its signature.