977 So.2d 78 (2007)
William L. HANCHETT, Jr. and Cheryl Bajon St. Romain
v.
STATE of Louisiana, through The DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 2006 CA 1678.
Court of Appeal of Louisiana, First Circuit.
November 7, 2007.
*79 C. Jerome D'Aquila, New Roads, Louisiana, for Plaintiffs/Appellees William L. Hanchett, Jr. and Cheryl Bajon St. Romain.
Charles C. Foti, Jr., Attorney General by David E. Marquette, Baton Rouge, Louisiana, for Defendant/Appellant State of Louisiana, through the Department of Transportation and Development.
Before WHIPPLE, KUHN, DOWNING, GAIDRY, and WELCH, JJ.
GAIDRY, J.
This highway-defect suit was filed by the parents of a driver killed in a single-vehicle accident on Highway 75 in Iberville Parish. For the following reasons, we amend and affirm as amended.

FACTS AND PROCEDURAL HISTORY
On August 28, 1994, William L. "Little Billy" Hanchett, III was killed in an automobile *80 accident on Highway 75 in Iberville Parish. Little Billy had been out drinking and shooting pool with a friend on the night of the accident. He was driving south on Highway 75 when he lost control of his vehicle and was ejected from the vehicle.
Little Billy's parents, William L. Hanchett, Jr. and Cheryl Bajon St. Romain, filed suit against the Louisiana Department of Transportation and Development ("DOTD"), alleging that the DOTD had the care, custody, control, and maintenance of Highway 75 and breached its duty to maintain the road in a reasonable and safe condition, resulting in Little Billy's death. After a trial, the jury concluded that Highway 75 had a defect which created an unreasonable risk of harm and that the defect was a cause in fact of Little Billy's accident. The jury also found that Little Billy was negligent in the operation of his vehicle and that his negligence was also a cause in fact of the accident. The jury allocated forty percent of the fault to Little Billy and sixty percent to DOTD. The jury awarded the sum of $30,000.00 to each of the plaintiffs for their loss of consortium due to their son's death.
The trial court rendered a judgment on December 15, 2005 incorporating the jury verdict and ordering DOTD to pay each of the plaintiffs $18,000.00 plus legal interest. Pursuant to a stipulation, the court also ordered DOTD to pay the plaintiffs $9,962.54, which represents sixty percent of the funeral expenses and medical expenses resulting from the accident. The court also set the expert witness fee for the plaintiffs' expert, taxed that fee as court costs, and ordered DOTD to pay all court costs.[1]
The plaintiffs filed a "Motion for a Judgment Notwithstanding the Verdict or in the Alternative, For Additur or New Trial." The plaintiffs asked the court to grant a judgment notwithstanding the verdict ("JNOV") on the issue of quantum, or in the alternative, to grant a new trial on the issue of quantum. DOTD filed its own motion for JNOV or for remittitur or new trial on the issues of the allocation of fault and quantum. The trial court granted the plaintiffs' motion for JNOV, increased the amount of the awards to the plaintiffs to $75,000.00 each, and denied the motions for new trial.
DOTD appealed the December 15, 2005 judgment and the February 22, 2006 judgment on the issues of liability, quantum, and the assessment of costs. The plaintiffs answered the appeal, assigning error to both the allocation of fault and quantum.

DISCUSSION
Anthony Pelotto was a passenger in Little Billy's vehicle at the time of the accident. He testified that he and Little Billy visited several bars on the night of the accident. Pelotto was drinking that night, and he saw Little Billy have one or two drinks in a five-hour period. Pelotto's description of the accident was that they were going into a "pretty deep curve" when the vehicle made a "little jump" like going over a railroad track, and the rear of the vehicle slid to the left. Little Billy tried to correct it, then it slid to the right, and the vehicle started flipping. Pelotto's next memory is of waking up in the road with people standing over him. He did not *81 remember how fast Little Billy was driving at the time of the accident, but admitted telling a police officer at the hospital on the night of the accident that he guessed they were going about 60 miles per hour.
Kermit W. Smith, a now-retired state trooper, investigated the accident in which Little Billy was killed. Upon arriving at the accident scene, he interviewed Pelotto and took measurements at the scene. When testifying at the trial, Trooper Smith had no independent recollection of his investigation, but he was able to testify based on his report from the accident. He testified that the speed limit on the section of road where the accident occurred was 55 miles per hour on the date of the accident and that he estimated the speed of Little Billy's vehicle as 55 miles per hour on his report because he was unable to determine the actual speed. Tests performed on blood drawn from Little Billy after the accident showed a blood alcohol level of .05 grams percent; Trooper Smith testified that in 1994, a blood alcohol level of .05 grams percent was not high enough to raise a legal presumption of intoxication, but such level was within the officer's charging discretion. Trooper Smith testified that he inspected hundreds of feet of the roadway and found no skid marks or defects in the road. He also testified that if someone had mentioned a dip in the road that would have been noted in his report.
Charles Cook, a retired sheriff's deputy, testified that he lives on Highway 75 and is familiar with the section of the road where the accident occurred. In 1994, he considered the road "very poorly maintained." In the area of the culvert, the right-hand side of the southbound lane had "dips," the shoulder "caved off," and it was "in bad shape." Deputy Cook normally tried to drive in the left lane at that point in the road because "it was real rough and I was in that curve one time and I like to have lost control of my car because there was a truck coming, I had to stay in. And from then on I either slowed down or I moved over." He also warned his wife and children to be careful when they drove in the southbound lane. He testified that the dangerous section of road was occasionally patched, only to deteriorate again.
Rhodie Sanchez, a detective with the Iberville Parish Sheriff's Department, also testified about the condition of Highway 75 in 1994. Although Detective Sanchez did not investigate the accident in which Little Billy was killed, he was familiar with that part of Highway 75. Detective Sanchez testified there was a "substantial dip" in the inside of the southbound lane at the location of the culvert and that "[i]f you traveled that particular curve in the southbound lane at any substantial speed it would tend to dip your vehicle and kind of throw your vehicle towards the northbound lane." According to Detective Sanchez, vehicles traveling at the posted speed limit of 55 miles per hour also experienced this effect. Detective Sanchez considered this dip to be hazardous and had reported it to his supervisor on several occasions.
Marion Weatherford testified that he lived on Highway 75 and the accident occurred in front of his house. He did not witness the accident, but went out to the scene after someone knocked on his door to tell him there had been an accident. Mr. Weatherford was the second person on the scene.[2] He saw Little Billy lying on the road and observed that he could smell alcohol when Little Billy breathed. There were beer bottles in the road and he found half a pint of whiskey on the seat in Little Billy's vehicle. Mr. Weatherford said that he was aware of a dip in the road, but that *82 the dip did not bother him because he did not speed in that curve. He disagreed with the descriptions of the road given by Deputy Cook and Detective Sanchez and said that the dip was not as bad as they described it.
Dr. Olin Dart testified as an expert in accident reconstruction on behalf of the plaintiffs. In preparation for his testimony, Dr. Dart visited the site of the accident in 2001. He noted that there is a culvert running under Highway 75 in the area of the accident. Dr. Dart testified that there is an inherent problem with building a road over a culvert due to the fact that, as time passes and vehicles travel over the area, the material used as backfill around the culvert begins to compact end eventually results in a dip in the road. Prior to Dr. Dart's 2001 visit to the site, Highway 15 was overlaid and widened. Dr. Dart testified that in 2001, the area where the culvert ran under Highway 15 contained a very slight depression, not a major dip, due to the overlay that had been performed. Although he was not able to examine the dip in the road as it existed in 1994, Dr. Dart testified that if there had been a pronounced dip at the location of the culvert that affected vehicles driving over it, that dip would be a defect and would likely be the cause of Little Billy's accident. Dr. Dart acknowledged, however, that excessive speed may have also been a cause of the accident, based on the point where Little Billy's vehicle first left the roadway. At a speed of 55 miles per hour, it would have taken Little Billy one hundred and forty-four feet to come to an emergency stop after encountering a defect in the road. With moderate braking as soon as he hit the dip, Little Billy could have brought his vehicle to a stop in three hundred and twenty-five feet if he had been traveling at a speed of 55 miles per hour. However, Little Billy's vehicle first left the roadway three hundred and sixty feet from the location of the culvert.
Dean Tekell, Jr. testified as an expert in accident reconstruction and traffic engineering on behalf of DOTD. Like Dr. Dart, Mr. Tekell did not inspect the accident site until years later, after the road had been overlaid. When he went to the accident site approximately one year before the trial, he observed cars driving over the culvert and through the curve and saw no adverse impact on the traffic. Mr. Tekell testified that he is unable to determine, from looking at pictures of the accident scene, whether a depression actually existed and how deep it was, as the pictures were not very clear. However, assuming that there was a significant enough depression to cause a car travelling at a speed of 55 miles per hour to lose control, Mr. Tekell would expect that car to exit the roadway on the left side. According to the police report, Little Billy's vehicle did not do this. Mr. Tekell also testified that if the dip in the road caused Little Billy to lose control of his vehicle while traveling at a speed of 55 miles per hour, his vehicle would have left the roadway much sooner than it actually did; he would have had to be going at a much higher speed to end up where he did. Mr. Tekell calculated that the truck was going about 30-48 miles per hour at the time it started to flip; if Little Billy was going 55 miles per hour, he could have brought the vehicle to a complete stop by the time he first left the road, yet he was still going 30-48 miles per hour when he started rolling. Based on his calculations, Mr. Tekell was able to conclude "definitively [that] this [dip] was not the source of that crash." Despite his conclusion, Mr. Tekell agreed with the plaintiffs' expert that if a road contained a dip that caused drivers to lose control when traveling below the speed limit, that was a defect which posed an unreasonable risk of harm.
*83 William L. Hanchett, Jr., Little Billy's father, testified that he and his son had a very close father/son relationship and shared several hobbies. Mr. Hanchett and Cheryl St. Romain, Little Billy's mother, were divorced, and Little Billy initially lived with Mr. Hanchett. Little Billy would visit his mother and talk to her on the phone, and Mr. Hanchett testified that Little Billy had a good relationship with his mother. When he was seventeen, Little Billy went to live with his mother, but still saw his father often. At the time of the accident, Little Billy worked with his father as a sandblaster and painter. On the night of the accident, Mr. Hanchett saw Little Billy at a pool tournament and bought him a beer. He said that Little Billy was not a person who drank a lot, and before Little Billy left, he bought him a Coke. The next time he saw Little Billy was in the hospital when "[h]e was on life support and I had to pull the plug, he was brain dead." Mr. Hanchett testified that the loss of his son has been really hard on him, that he wonders what his grandchildren would have looked like, and that he has suffered nightmares in which his son told him that he was not really dead. Mr. Hanchett described the condition of Highway 75 around the date of the accident:
The road had the dip in the road, it was like an eight to ten-inch dip. And you had to stay to the left of it to try to straddle it sometimes. And if a vehicle was coming to you you had no choice but to stay in the lane and maintain control of your vehicle if you could. They had overlays that they go out and do patchwork and they had different stages on the road in that curve, they could throw you to the left and it also could throw you to the right, all depends, you know, on what the situation when a car is coming. . . . And at nighttime, people going through there at night they didn't know. I mean, it just  they didn't know.
Mr. Hanchett said that he taught Little Billy to drive and had instructed him that if he ever lost control of his vehicle, he should get control of his vehicle and try to slow down as much as possible, rather than slamming on his brakes.
Cheryl Bajon St. Romain testified that she also had a close relationship with her son. Even when he was living with his father, she saw him three or four times a week and would talk to him on the phone. Little Billy was living with her at the time of his death. She testified that they did not live near Highway 75, and she did not know of an occasion when Little Billy would have traveled that section of the road before his accident. On the night of the accident, she received a phone call that he had been in an accident and went out to the scene. She saw him lying on the road and went to him, but was not allowed to hold him. She testified that she has had a hard time dealing with Little Billy's death.

Liability
On appeal, DOTD alleges that the jury erred in finding it liable for Little Billy's accident and death because the record did not establish that a condition of the roadway caused the accident. DOTD bases its argument on the fact that a dip cannot be clearly seen in the pictures of the accident scene and also that, according to the experts' calculations, if Billy had lost control due to a defect in the area of the culvert, he should have left the road in a different location than he ultimately did.
From our review of the record, however, it is clear that there was sufficient evidence presented from which the jury could reasonably conclude that there was an unreasonably dangerous defect on Highway 75 which caused Little Billy to lose control of his vehicle. Although the expert witnesses were not able to observe the condition *84 of the road on the date of the accident, the existence of a dip in the road in 1994 was confirmed by several witnesses. It appears from the verdict that the jury believed Anthony Pelotto, Little Billy's passenger, that Little Billy hit something in the road before he lost control. Although both experts did agree that if Little Billy was going 55 miles per hour, he could have stopped his vehicle before the point where he first left the road even with moderate braking, and Mr. Tekell calculated that Little Billy was still going 30-48 miles per hour at the point where his vehicle began to flip, this does not prove that the highway defect did not cause Little Billy to lose control. The jury could have reasonably concluded that Little Billy was going faster than 55 miles per hour or that his consumption of alcohol slowed his reaction time. Given that the jury assigned 40 per cent of the fault to Little Billy, it is likely that they found that he was speeding and/or impaired. by alcohol. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State Through Department of Transportation and Development, 92-1328, 617 So.2d 880, 883 (La.1993). The jury's verdict on liability is supported by the evidence, and we find no merit in DOTD's argument that the jury erred in finding it partially liable for the accident. This assignment of error is without merit.
In their answer to the appeal, the plaintiffs allege that the jury erred in assigning any fault to Little Billy in the accident because there was no evidence of speeding in the record, nor was there any evidence that he was under the influence of alcohol. As noted above, there was sufficient evidence in the record from which the jury could, and likely did, conclude that speed and/or alcohol were factors in this accident. These claims by plaintiffs lack merit.

Quantum
Both parties have challenged the amount of general damages awarded in this matter. DOTD alleges that the trial court erred in increasing the amount of the award to the plaintiffs from $30,000.00 each to $75,000.00 each, because the jury made its award after having the opportunity to observe the demeanor of the witnesses.[3] The plaintiffs allege that the award of $75,000.00 per parent was so low as to constitute an abuse of discretion and the award should be increased.
A JNOV may only be granted when the evidence, viewed in the light most favorable to the party opposing the motion, points so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. In deciding whether to grant a JNOV, the trial court may not weigh the evidence, pass on the credibility of the witnesses, or substitute its reasonable inferences from the facts for those of the jury. When a JNOV is granted on the issue of quantum because the trial court concludes that reasonable men could not disagree on the fact that the award is abusively high or low, the trial court must next determine the proper amount of damages to be awarded. The judge is not constrained in making this determination as courts of appeal are to raising or lowering the award to the lowest or highest point which is reasonably within the discretion afforded the court. This is because *85 a trial judge is in a better position to make a damage assessment than an appellate court, since the trial judge hears the testimony, views the evidence;, and is able to evaluate witnesses' credibility. After granting JNOV on the damage award, the trial court becomes the trier of fact and makes an independent assessment of the damages and awards a proper amount of compensation under the facts of the case. Miley v. Louisiana Farm Bureau Cas. Ins. Co., 90-0689, 599 So.2d 791, 802 (La. App. 1 Cir.1992), writ denied, 604 So.2d 1313 (La.1992).
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV on the quantum. This is done by using the same criteria the trial judge used in determining whether to grant the motion, i.e., whether reasonable men could differ as to the fact that the jury award was abusively high or low. If the appellate court determines that the JNOV was properly granted, the trial court's independent assessment of the damages is then reviewed for an abuse of discretion. In reviewing general damage awards, an appellate court must accord much deference to the trial court. Robinson v. North American Salt Co., 02-1869, p. 18 (La.App. 1 Cir. 6/27/03), 865 So.2d 98, 111, writ denied, 03-2581 (La.11/26/03), 860 So.2d 1139. The discretion vested in the trial court is great, and even vast, and an appellate court should only disturb an award of general damages if the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Robinson, 02-1869 at pp. 18-19, 865 So.2d at 111. Once the appellate court has determined that an abuse of discretion has occurred, it may look to prior awards for the purpose of determining the lowest point which is reasonably within the court's discretion. Youn, 623 So.2d at 1260-61.
The trial court was correct in granting JNOV and increasing the general damages award because reasonable minds could not differ on the fact that an award of $30,000.00 to each of the plaintiffs for the loss of their eighteen-year-old son was abusively low. However, the court's award of $75,000.00 to each of the plaintiffs is so low as to constitute an abuse of discretion. After reviewing awards made in similar cases, we conclude that the lowest award reasonably within the discretion of the court is $125,000.00 for each plaintiff. The judgment of the trial court is amended to increase the general damages award to the plaintiffs from $75,000.00 each to $125,000.00 each.

Costs
The jury in this case found DOTD to be 60 percent at fault. DOTD argues on appeal that the trial court erred by casting all court costs against it, contending that it should have been cast with only 60 percent of the court costs in accordance with the jury's allocation of fault.
While the assessment of costs may be made to reflect the percentage of negligence attributable to each party, La. C.C.P. art. 1920 grants the trial court discretion to assess costs in any equitable manner. This article has been liberally interpreted as granting broad discretion to the trial court. Upon review, an appellate court will not disturb the trial court's fixing of costs absent an abuse of the sound discretion afforded the trial court. Gauthier v. Wilson, 04-2527, p. 6 (La.App. 1 *86 Cir. 11/4/05), 927 So.2d 383, 387, writ denied, 05-2402 (La.3/31/06), 925 So.2d 1258. In this case, the jury concluded that DOTD was substantially at fault in causing the death of the plaintiffs' son. We do not believe the trial court abused its broad discretion in taxing all costs in this matter to DOTD.

DECREE
The judgment of the trial court is amended to increase the award to the plaintiffs to $125,000.00 each and as amended, affirmed. Plaintiffs' answer to appeal is granted in part. All costs of this appeal, which have been confirmed by the 18th Judicial District Court in the amount of $1,800.00, are assessed to DOTD.
AMENDED AND AFFIRMED AS AMENDED; ANSWER TO APPEAL GRANTED IN PART.
KUHN, J., dissents and assigns reasons.
DOWNING, J., dissents for the reasons assigned by KUHN, J.
KUHN, J., dissenting.
I disagree with the majority's substitution of its judgment for that of the jury and the trial judge. I do not believe the record supports the grant of the JNOV of the jury's verdict in the first instance; and certainly do not see that the trial court abused its discretion in the quantum awarded in the second.
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Simoneaux v. Amoco Production Co., 02-1050, p. 11 (La.App. 1st Cir.9/26/03), 860 So.2d 560, 567, writ denied, 04-0001 (La.3/26/04), 871 So.2d 348. The trial court may not evaluate the credibility of witnesses in ruling on the motion, and all reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Id. This rigorous standard is based on the principle that "[w]hen there is a jury, the jury is the trier of fact." Id.
I disagree that in this case the facts and inferences point so strongly and overwhelmingly in favor of Mr. Hanchett and Ms. St. Romain that reasonable persons could not arrive at a contrary verdict. Clearly, there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.
Moreover, when the trial judge adjusted the wrongful death award upward from $30,000 to $75,000 for each of the decedent's parents, there was no abuse of his much discretion in making the award. Exactly what evidence does the majority rely upon to find the abuse of discretion?
The jury heard the witnesses and evaluated the losses based on the evidence presented. For a reviewing court to reweigh that evidence and determine different amounts of money are better warranted for the losses suffered is an obvious usurpation of the jury's role.
For these reasons, I dissent.
NOTES
[1] A second judgment was rendered by the court on December 15, 2005. Both the first and second judgments were filed into the record on December 23, 2005 at 11:00 a.m. In this second judgment, the court fixed the expert witness fee for the plaintiffs' expert (same expert, same amount as the first judgment), taxed that fee as court costs, and ordered DOTD to pay all court costs.
[2] The first person on the scene did not testify at trial.
[3] DOTD argues that the trial court erred in granting the "additur." Although there is no transcript of the hearing on these motions in the record, it is clear from a review of the judgment and the minute entry that the trial court actually granted the plaintiffs' motion for JNOV and then increased the award of general damages.