PETTIGREW, J.
I aThis is an appeal by the Louisiana Department of Transportation and Development (DOTD) of a judgment that held it was 30 percent at fault in causing an accident and the resulting injuries to Anya Marie Falcon, an interdict as a result of the injuries sustained in the accident. Ms. Falcon is represented in this matter by her father, Charles Falcon, in his capacity as her curator, and also in the capacity as the tutor of his minor grandchildren, who were also awarded damages for the injuries, sustained by their mother. DOTD assigns error to the jury’s assessment of fault, to it in causing the accident and the resulting injuries, as well as to the JNOV/additur granted by the trial court, increasing the damages awarded by the-jury. For the following reasons, we affirm the jury’s assessment of fault to DOTD, as well as the additional damages awarded by the trial court’s granting the JNOV.
FACTUAL BACKGROUND
On September 13, 2007, at approximately 5:40 a.m., twenty-six-year-old Anya Marie Falcon was driving her 1998 Honda Accord sedan with her three children as passengers (six-year-old Abigail M. Falcon, three-year-old Nikki L. Hanchett, and one-year-old Landon P. Hanchett), in an easterly direction on St. Louis Road (a/k/a Tenant Road or La. Hwy. 992-3), just south of Plaquemine, in Iberville Parish. Ms. Falcon was on her way to drop her children off at before-school care and daycare, and then proceeding to her job at Georgia Gulf. As Ms. Falcon entered the “T-shaped” intersection of St. Louis Road and La. Hwy. 1, her vehicle was struck broadside by a 2002 Ford F-150 pickup truck operated by Moses Williams • that was travelling in the right southbound lane of La. Hwy. 1, approaching its intersection with St. Louis Road.
At the time of impact, it was not yet daylight. It was dark and raining, the roads were wet, and both vehicles involved had the headlights on. At the point of impact, La. Hwy. I consists of five lanes of travel, two southbound lanes, two northbound lanes, and a center turn lane. The intersection of St. Louis Road and La. Hwy. 1 is controlled by a stop sign for *481 motorists travelling on St. Louis Road toward Hwy. 1; there are no controlling signs for motorists travelling on La. Hwy. 1, the favored roadway, which has a 1 ¿posted speed limit of 45 miles per hour. The record established that the stop sign was located approximately 34 feet before the intersection, primarily for purposes of visibility.
At the time of the accident, a large “billboard” political sign, measuring sixteen (16) feet in width by eight (8) feet in height, promoting the candidacy of Glenn Patrick for the office of tax assessor for Iberville Parish, had been placed along the shoulder of La. Hwy. 1, just north of its intersection with St. Louis Road. The large sign was on the property of Edward J. Gay Planting and Manufacturing Co. (Gay), and extended two feet into the state’s (DOTD’s) right of way along La. Hwy. 1, in violation of La. R.S. 48.461.2.[1] The placement of the large sign was also in violation of La. R.S. 48:347, which specifically addresses the placement df political campaign signs.[2]
| sit is alleged that the placement of the large sign obstructed Ms. Falcon’s view, such that she was unable to see the oncoming vehicle driven by Moses Williams, despite having stopped at the stop sign prior to entering the roadway.
Following the accident, Moses Williams, and Ms. Falcon’s three children, whose injuries were relatively minor, were treated and released from River West Medical Center. However, Ms. Falcon, who sustained severe injuries, was transported by ambulance and hospitalized at Our Lady of the Lake Regional Medical Center in Baton Rouge. Ms. Falcon remained in a *482 coma for several weeks, during which she was unable to speak or assist in her care. Following her hospitalization, after coming out of the coma, Ms. Falcon was transferred and confined to Touro Medical Center in New Orleans for rehabilitation, evaluation, and continuing treatment of severe brain, injuries. She also sustained other physical injuries that will be discussed in further detail later herein. However, her most significant injury was a severe and permanent closed head injury, which left her with the mind of a child, requiring supervision and monitoring, and also resulting in her interdiction. She now lives with her mother, and no longer has custody of nor lives with her children. Her daughters now live with their maternal grandfather (the plaintiff herein) and his wife, and her son lives with a cousin.
By all accounts, the record establishes that prior to the accident, Ms. Falcon was a beautiful, intelligent, vibrant, gainfully employed single mother, with a happy family life. The injuries she sustained as a result of the accident permanently rendered her a “shelf’ of her former self.
PERTINENT PROCEDURAL HISTORY
On October 17, 2007, Charles E. Falcon, individually and in his capacity as the natural curator of his interdicted daughter, filed a petition for damages naming as | rvdefendants DOTD, Glenn Patrick, Gay, and their insurers. Mr. Falcon also asserted loss of consortium claims on behalf of Ms. Falcon’s three minor children. Mr. Falcon alleged that the cause of the accident was the obstruction created by the political sign within the right of way of La. Hwy. 1, which rendered it impossible for Ms. Falcon to see any southbound vehicle, despite stopping at the stop sign prior to entering the roadway.
Following extensive discovery and numerous pre-trial motions, hearings, decisions, and appeals, a nine-day jury trial began on April 16, 2012. After the trial, the jury concluded that all parties, including Ms. Falcon, bore some responsibility for causing the accident and the resulting injuries. The jury determined that the political sign created an unreasonably dangerous condition, as it was an obstruction of vision for motorists travelling east on St. Louis Road, approaching the intersection with La. Hwy. 1, rendering it impossible to see any vehicles approaching the intersection. The jury assessed 50 percent fault to Glenn Patrick for placing the large sign near the roadway and within DOTD’s right of way, in violation of law, and 30 percent fault to DOTD, which had actual notice of the placement of the large sign in its right of way and failed to remove the large sign and eliminate the sight obstruction created thereby. The jury also assessed 10 percent fault to the landowner (Gay), for failing to remove the large sign, and 10 percent fault to Ms. Falcon, for failing to yield to oncoming traffic when she reached the intersection at La. Hwy. 1, despite having stopped at the stop sign, which was located 35.9 feet prior to that intersection. The jury awarded $575,000.00 in general damages. A judgment on the jury verdict was signed on May 23, 2012. A revised judgment on the jury verdict (correcting the addition of the damages awarded by the jury) was signed on November 21, 2012.
. Following the jury verdict, Mr. Falcon filed a motion for JNOV, and in the alternative, additur, which motion was granted by the trial court, resulting in an increase to the amount of general damages by $3 million, to $3,575,000.00. Judgment in accordance therewith was rendered on October 22, 2012.
*483 JjDOTD’S APPEAL AND ASSIGNMENTS OF ERROR
DOTD has suspensively appealed both the revised judgment of the jury verdict as well as the judgment reflecting the trial court’s grant of the JNOV/additur. On appeal, DOTD asserts that (1) the jury committed manifest error in finding DOTD breached its duty to Ms. Falcon given that she “had over 20 feet of unobstructed view as she traveled down the inferior roadway to the intersection with the favored roadway;” (2) the jury manifestly erred in finding Ms. Falcon was only 10 percent at fault when “she had 20 feet of unobstructed view and failed to yield to oncoming traffic;” (3) the jury manifestly erred in finding DOTD had notice of an unreasonably dangerous condition and failed to correct the condition within a reasonable time; and (4) the trial court erred in granting JNOV and increasing the general damage award under the facts of this case.
APPLICABLE LAW, DISCUSSION, AND ANALYSIS
Assignments of Error Numbers One and Two — Breach of Duty and Assessment of Fault
In order for DOTD to be held liable for Ms. Falcon’s injuries, the plaintiff bears the burden of proving that: (1) DOTD had custody of the thing that caused the plaintiffs injuries; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive knowledge of the unreasonable risk of harm; (4) and failed to take corrective measures within a reasonable time; and (5) the unreasonable risk of harm was a cause-in-fact of the plaintiffs injuries. Netecke v. State ex rel. DOTD, 98-1182, 93-1197 (La.10/19/99), 747 So.2d 489, 494; see La. R.S. 9:2800 and La. C.C. art. 2317. DOTD’s general duty is to maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. Stewart v. State ex rel. Department of Transportation and Development, 2008-0772 (La.App. 1 Cir. 3/20/09), 9 So.3d 957, 960, writ denied, 2009-1228 (La.9/18/09), 17 So.3d 968 (emphasis in original). This duty extends not only to prudent drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Id. (emphasis added). Whether DOTD breached its duty to the public, by knowingly | ^maintaining a defective or unreasonably dangerous roadway, depends on all the facts and circumstances on a case by case basis. Stewart, supra, at 961.
In addition to its general duty, in this matter, DOTD had the duty provided in La. R.S. 48:461.7 to remove any outdoor advertising sign within six hundred sixty feet of the nearest edge of the right of way, visible from the main traveled way of the state’s highways. Moreover, pursuant to La. R.S. 48:347, the erection, display, or posting of political signs within state highway rights of way is prohibited. Given that the political sign in this case indisputably was contained ivithin DOTD’s right of way, these duties were breached outright.
Nevertheless, DOTD argues that because there was twenty (20) feet of unobstructed roadway between the stop sign and the intersection where the collision occurred, Ms. Falcon could have observed the oncoming truck operated by Moses Williams and, therefore, the jury was manifestly erroneous in apportioning only 10 percent fault to her, and in finding DOTD liable at all in causing this accident.
DOTD’s argument may have merit if the evidence established that a driver *484 could see the large sign from the stop sign, such that it would be known that the driver’s vision was obstructed thereby. However, DOTD ignores the evidence in the record that clearly established that the large sign not only obstructed Ms. Falcon’s vision and prevented her from seeing any oncoming vehicles, but because it was dark at the time of the incident, Ms. Fab con also had no way of knowing that there was a large sign in the right of way that was obstructing her view. Indeed, videos submitted into evidence by the plaintiff and the defendants, viewed by the jury (and reviewed by this court), confirm that at the location of the stop sign, the view toward the left was completely obstructed, i.e. total darkness, (The evidence further established that in the same manner, the placement of the large sign obstructed the vision of drivers, such as Moses Williams on La. Hwy. 1, from seeing any vehicles approaching the intersection from St. Louis Road.)
It is undisputed that at the time of the accident, it was dark, raining, and there was no illumination on the sign. These conditions rendered it impossible for a driver who looked to the left at the stop sign to even know that his/her vision was obstructed. [3Instead, because of the placement of the sign, the view to the left revealed absolutely nothing. Thus, a reasonable assessment by a driver at that location in the roadway was that nothing was approaching, and that it was safe to proceed toward and into the intersection only.twenty feet away. In other words, there was, no indication that there was a need to stop again at the intersection twenty fact ahead of the stop sign to re-ensure that the path was clear. The videos revealed that a vehicle approaching the intersection at La. Hwy. 1, as was the truck being driven by Moses Williams in the pre-dawn hours on the date of this accident, disappears completely from view for nearly sixteen seconds behind the political sign (which was also obstructed from view by the darkness), only to appear in the line of vision approximately four seconds immediately prior to the intersection. Thus, even if Ms. Falcon looked to the left again prior to entering the intersection, in all probability, it would have been too late to avoid the collision that followed.
The cases cited by DOTD, urging that the jury committed manifest error in finding that the large sign created an unreasonable risk of harm sufficient to allocate some fault to DOTD; i.e., Burge v. City of Hammond, 509 So.2d 151 (La.App. 1 Cir.), writ denied, 513 So.2d 285 (La.1987), and Johnson v. State, Department of Transportation and Development, 492 So.2d 517 (La.App. 3 Ctr.), writ denied, 496 So.2d 349 (La.1986), are distinguishable in very significant respects. First and foremost, in both of those cases, the alleged unreasonably dangerous conditions were caused by obstructions (a building in Burge, and trees, brush, and undergrowth in Johnson) that were readily apparent to the plaintiff drivers. The plaintiffs had a full view of the obstructions and failed to proceed with the caution necessary.’ Thus, those drivers, unlike Ms. Falcon in this case, who could not even see the sign and was completely unaware that her vision was obstructed, were alerted to the fact that their vision was obstructed, such that they had a heightened duty to proceed with extra caution when approaching and proceeding through the intersections where the accidents occurred. Additionally, in both of those cases, it was alleged that the traffic signals in place at those intersections were deficient; however, the plaintiffs failed to show that another type of traffic signal, had it been in l^place, would have prevented the accident, due to the plaintiffs’ own negligence in proceeding when they knew their vision was ob *485 structed. Therefore, those cases are neither relevant nor controlling in matter. As noted earlier in this opinion, whether DOTD created an unreasonably dangerous risk of harm to travelling motorists is a factual determination that must be made on a case by case basis, according to the facts and circumstances of each case.
The jury in this case listened to several days of testimony, including the accident reconstruction experts presented, by the plaintiff and DOTD, and viewed re-creation videos also submitted by both sides. We also have reviewed that same evidence. That evidence reasonably and amply supports the jury’s factual findings that the placement of the billboard sign on DOTD’s right of way created an. unreasonable risk of harm to drivers travelling on St. Louis Road approaching La. Hwy 1, and that risk was a cause-in-fact of the ensuing collision that caused Ms. Falcon’s injuries Accordingly, assignments of error numbers one and two, which challenge the jury’s assessment of 30 percent fault to DOTD and “only” 10 percent fault to Ms. Falcon nave no matter.
Assignment of Error Number Three — Notice
As noted earlier, one of the essential elements a plaintiff must prove in order, to support a valid assessment of fault to DOTD is that DOTD had actual or constructive knowledge of an unreasonable risk of harm to traveling motorists and failed to correct or remove it within a reasonable period of time. La. R.S 9:2800(C). DOTD argues the jury committed manifest error in finding it had such notice and failed to remedy the condition. In this matter, the unreasonable risk of harm is the presence of the very large political sign within DOTD’s right of way.
In support of its argument, DOTD relies primarily oh the testimony of state troopers who testified that they saw the large sign, and did not think it caused an obstruction to motorists travelling on St. Louis-Road approaching La. Hwy 1. At the outset, we note this reliance is misplaced. It is not the function of state troopers (or any other witnesses) to assess liability based on their own personal opinions; the assessment of liability is left to the fact finder. Moreover, none of the troopers who testified to their Impersonal knowledge of the large sign’s placement witnessed the sign, or the obstruction it may have caused, under the particular factual circumstances present when this accident occurred; i.e., in complete darkness, when there was a heavy rainfall.
DOTD also argues that because the large sign was only in place for approximately thirty days, that fact alone, absolves it of failing to identify and correct the problem caused thereby within a reasonable amount of time. Yet, the statute itself does not specify a particular amount of time that is deemed reasonable, nor does DOTD cite any authority to support its contention that thirty days is an unreasonable amount of time to identify and correct the defect. Again, as noted earlier, these factual determinations are to be made on a case by case basis, and based on the particular facts and circumstances presented in each case.
Finally, DOTD notes that the large sign was placed by Glenn Patrick, and not by or under the direction of any DOTD employee or official. This fact does not dispense DOTD’s duty to know what it should have known and take corrective measures based on that knowledge. Harris v. State, Department of Transportation and Development, 2007-1566 (La.App. 1 Cir. 11/10/08), 997 So.2d 849, 865-866, mil denied, 2008-2886 (La.2/6/09), 999 So.2d 785.
*486 The foregoing constitutes the entirety of the argument presented by DOTD in support of its assertion that it did not have the requisite notice that the large sign posed an unreasonable risk of harm to the travel-ling public such that DOTD had a duty to remedy.the condition. Notably, from this entire record, we find that, aside from the testimony of several state troopers, who testified as to their own personal opinions, and from the testimony of a DOTD employee, Carmen Hernandez (the person who would have received complaints from the public), who testified she did not receive any complaints, DOTD cites no other evidence, bearing on the issue of notice, to support its assertion that the jury committed manifest error in finding it had the required notice to support any assessment of fault to it.
However, our review of the record reveals the following. First, as noted earlier (and while recognizing that a violation of a statute, alone, is not a sufficient basis upon 112which to access DOTD with fault in causing the accident), the existence of the large sign in DOTD’s right of way — a fact which is not disputed by DOTD — is in violation of state laws, i.e., La, R.S, 48:461.2 and La R.S. 48:347 [3] The record contains the testimony of Mr. Herman Oliver, a DOTD foreman who supervised crews at the time that the accident in this matter took place. Mr. Oliver’s testimony established that DOTD had actual notice that the large sign was in DOTD’s right of way, in violation of the aforementioned statutes. Mr. Oliver testified that part of his job was to make rounds and identify and remove hazards and problems on state highways, including the fifty-foot area from the roadways that comprise DOTD’s rights of way. He confirmed that during the week leading up to the date this accident took place, including the day prior to the accident (i.e., from September 4, 2007 through September 12, 2007), he and the crew he was supervising were mowing and weeding DOTD’s right of way along La. Hwy. 1 near its intersection with St. Louis Road. He further confirmed knowledge of the existence of the political sign for Glenn Patrick, located partially on DOTD’s right of way. He testified that, although it was part of his job to remove any signs or other objects located in DOTD’s rights of way, he did not instruct his crew to remove this particular sign because he did not consider it an obstruction to the travel-ling public. However, he also admitted that his assessment of the large sign regarding its placement and the safety to the public was made during the daylight hours, and not in the darkness that existed when the accident at issue occurred. While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to discover that which is easily discoverable. Harris, 997 So.2d at 865-866.
The jury’s finding that DOTD had actual notice of the existence of a large sign within DOTD’s right of way, and that DOTD had constructive knowledge that such placement of the sign constituted an unreasonably dangerous condition under the facts and circumstances of this particular case is sufficiently supported by the foregoing |1sevidence in the record, such that it cannot be held to constitute manifest error. Accordingly, assignment of error number three lacks merit.
Assignment of Error Number Four — JNOV/Additur
Following a nine-day trial, the jury returned a verdict, finding that the place *487 ment of the political sign constituted an unreasonably dangerous condition and that it contributed causally to the accident. As earlier noted, the jury assigned fault at 10 percent to Gay, as landowner, 50 percent fault to Glenn Patrick, the candidate for whom the large sign was placed, 30 percent fault to DOTD, because the large sign was improperly located within DOTD’s right of. way and created a visual obstruction that caused the accident, and 10 percent fault to Ms. Falcon.
Past Lost Wages $108,500.00
Future Lost Wages $505,000.00
Past Medical Expenses $725,608.46
Future Medical Expenses $3,000,000.00
Relevant to the last issue raised in this appeal — the JNOV granted by the trial court, increasing the general damage award — the jury also awarded the following in general damages, totaling $575,000.00:
$100,000.00 Past Physical Pain and Suffering
$75,000.00 Future Physical Pain and Suffering
$75,000.00 Past Mental Anguish
$50,000.00 Future Mental Anguish
$25,000.00 Past Loss of Enjoyment of Life
$75,000.00 Future Loss of Enjoyment of Life
$175,000.00 Scarring and Disfigurement
The jury also awarded damages to Ms. Falcon’s three minor children; $195,000.00 to the oldest child, and $150,000.00 to each of the two younger children.
Following rendition of a judgment on the foregoing jury verdict, the plaintiff filed a motion for judgment notwithstanding the verdict (JNOV) on the issue of quantum or in the alternative, motion for additur, asserting that the $575,000.00 general damage award to Ms. Falcon and the respective awards to the children were abusively low. 114Specifically, plaintiff claimed that Ms. Falcon was awarded general damages “that one would expect in a simple rear-end collision necessitating a spinal surgery,” and one greatly insuffi-
It is apparent that the jury believed the testimony and evidence presented on the full extent of Ms. Falcon’s losses and injuries and her need for future care, as reflected by the special damage awards, which are as fallow: cient to compensate the traumatic, severe, and permanent brain injury, together with a shattered hip, fractured pelvic bone, lacerated spleen, and severed diaphragm, all of which the evidence proved she suffered as a result of the accident.
The trial court granted the JNOV/addi-tur, increasing Ms. Falcon’s general damage award by $3,000,000.00, and denied it as to the awards to her minor children. DOTD asserts the JNOV was unwarranted, and should be reversed. For the following reasons, we affirm.[4]
JNOV Standard
Louisiana Code of Civil Procedure article 1811 allows a party to move *488 for a JNOV. This court has recognized the following established standard to be used in determining whether a JNOV has been properly granted: JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable, persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination; the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Smith v. State, Department of Transportation and Development, 2004-1317, 2004-1594 (La.3/11/05), 899 So.2d liS516, 524-25; Mason v. Hilton, 2013-2073 (La.App. 1 Cir. 11/7/13), 2013 WL 5969104 (unpublished opinion).
The trial court must first determine whether the facts and inferences point so strongly and overwhelmingly in favor of the plaintiff that reasonable jurors could not arrive at a contrary verdict. In other words, if reasonable persons could have arrived at the same verdict, given the evidence presented to the jury, then a JNOV is improper. Id.
When JNOV is granted on the issue of quantum because the trial court concludes reasonable men could not disagree on the fact that the award is abusively high or low, the trial court must next determine the proper amount of damages to be awarded. The judge is not constrained in making this determination as courts of appeal are to raising or lowering the award to the lowest or highest point which is reasonably within the discretion afforded the court. After granting JNOV on the damage award, the trial court becomes the trier of fact and makes an independent assessment of the damages and awards a proper amount of compensation under the facts of the ease. Hanchett v. State, ex rel. Department of Transportation and Development, 2006-4678 (La.App. 1 Cir. 11/7/07), 977 So.2d 78, 84-85.
An appellate court reviewing a trial court’s grant of a JNOV employs the same criteria used by the trial court in deciding whether to grant the motion. The appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. If the answer is in the affirmative, then the appellate court must affirm the grant of the JNOV. However, if the appellate court determines that reasonable minds could differ on that finding, then the trial court erred in granting the JNOV, and the jury verdict should be reinstated. Mason, supra.
Our initial inquiry is whether the evidence at trial so overwhelmingly supported an increase in general damages to Ms. Falcon that reasonable jurors could not have concluded otherwise. If so, then the trial court was correct in granting the JNOV. However, if reasonable jurors in the exercise of impartial judgment might conclude from | T6the evidence that Ms. Falcon was entitled to general damages in the amount the jury awarded, then the trial court erred in granting the motion, and the jury’s verdict should be reinstated. See Id.
*489 The role of the appellate court in reviewing the awards of general damages is not to decide what it considers to be. an appropriate award, but rather, to review the exercise of discretion by the trial court. This court must accord much deference to the trial court insofar as the amount of damages awarded., Hanchett, supra. Only if and when the appellate court determines that an abuse of. discretion has occurred in the amount of damages awarded, may it look to prior awards for the purpose of determining the lowest point which is reasonably within the court’s discretion. Id.; see also Mason, supra.
General Damages
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1 Cir.), writ denied, 605 So.2d 1373-1374 (La.1992). The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Jenkins v. State ex rel. Department of Transportation and Development, 2006-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, 767, writ denied, 2008-2471 (La.12/19/08), 996 So.2d 1133. Much discretion is left to the judge or jury in the assessment of general damages. La.C.C. art. 2324.1. In reviewing an attack on a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion/and if the total general damage award is not abusively low, it may not be disturbed. Graham v. Offshore Specialty Fabricators, Inc., 2009-0117 (La.App. 1 Cir. 1/8/10), 37 So.3d 1002, 1018.
Evidence Presented/Application of Law
The undisputed evidence at trial established that prior to the accident, Ms. Falcon was a single, attractive, healthy, employed mother of three children, whom she raised on j17her own, who lived with her, and with whom she shares and enjoyed a happy and fulfilled family life. At the time of the accident, the children were all in school or daycare during the day, while Ms. Falcon was employed at Georgia Gulf. Ms. Falcon was independent, and could do all the things a normal young adult is capable of doing.
Immediately following the accident, Ms Falcon was hospitalized at Our Lady of the Lake Regional Medical Center for several weeks, during which time she was treated for the various physical injuries noted above. She was also in a coma due to the severe closed head injury she sustained in the accident. She came out of the coma with permanent brain damage and was in an infantile state. She was transferred to Touro Medical Center in New Orleans for extensive rehabilitation While at Touro, she had to re-learn how to eat, walk, bathe, clothe herself, and perform all the other basic functions of daily hygiene and living. By all accounts, she progressed while at Touro, and while she can now perform those basic functions of life and;s no longer in an infantile state, she was discharged from Touro with a “severe permanent brain injury” and will remain a “shell” of her former self. She has a significantly diminished IQ, as evidence reflects that she has the brain of a ten- to fifteen-year-old child. She resides with her mother and can no longer raise or care for her own children (two live with her father, and one lives with a cousin). It is also undisputed that the accident left her with a permanent gait problem, commonly known as a “drop foot.” She is unsteady in her movements, falls down often, and is un *490 coordinated. Because of her physical injuries, her aging process will be complicated, and she will have a permanent need for orthopedic attention. For example, it is medically predicted that as she gets older, her movement limitation will significantly increase to such a degree that she will likely be wheelchair-bound by the age of fifty. She has double vision (for which she has had eye surgery), and has speech and articulation problems.
Moreover, because of her brain injury, she suffers from unpredictable moods, anger, lack of impulse control, poor judgment/poor decision-making, and lack of insight, including a lack of understanding of her own limitations; and she will suffer from early dementia. She has both learning deficits and memory problems. Because of these 11Rdeficits, she is unable to go places on her own, to manage money, or cook. She cannot parent her children. She will never be gainfully employed, and she cannot be trusted to live independently, unless the environment in which she lives is completely structured and does not change at all. She also suffers from muscle spasms, dexterity issues, posturing problems, and has trouble sleeping.
While the precise level of supervision she will need for the rest of her life was somewhat disputed among the experts, it was undisputed that she will always require some level of monitoring (due to the above noted mental deficiencies) and will always need some type of close support system.
As stated by her mother, with whom she currently lives, one of the most difficult aspects of the limitations Ms. Falcon, suffered as a result of the accident is the fact that she is not totally unaware of what is going on with her condition. Thus, she is a thirty-one-year-old woman, with the mind of a child; yet, she is aware of how she used to be and of ail that she has lost. As a consequence, she is very adamant and argumentative about wanting to do the things she used to be able to do; i.e., drive a car, live in an apartment, and parent her children, despite the fact that she “knows” she is unable to do so. Her treating neu-ropsychologist, Dr. Robert Davis, confirmed this in his testimony, stating that a significant part of her problem Is her view of herself, knowing that she has lost a “great many things that define her,” and as a result, feeling alone and abandoned. At the same time, however, she cannot be trusted to abide by the limitations of which she is aware, due to her impulse control issues and her lack of judgment and insight; thus, the. undisputed evidence proves that at least some level of supervision and monitoring will always be necessary.
In arguing that the JNOV was improperly granted, DOTD focuses on the disputed testimony regarding the amount of supervision Ms. Falcon needs, noting that she is often left home alone for several hours during the day while her mother is at work. First, we note that as to the level of supervision necessary, the jury made a credibility determination and awarded the full amount needed for a future life care plan.' Thus, DOTD’s argument that the general damage award was based on this credibility | ^determination is misplaced. Moreover, although the record reveals that Ms. Falcon does stay home alone for several hours per day, her mother’s testimony revealed that once Ms. Falcon wakes up, she is on the phone “constantly” calling her at work, reflecting on Ms. Falcon’s limited ability to be left alone And while, as DOTD argues, Ms. Falcon is able to get dressed and operate a microwave oven to fix meals at home, her mother testified that on occasions, she has exceeded her limitations, attempting to use the stove (burning an oven mitt in the *491 process), and has “blown up” one microwave oven.
We also find it noteworthy that DOTD’s arguments focus on the menial activities that Ms. Falcon can do, but they completely ignore the devastating and drastic change in her life from what it was before the accident and what her life could have been had the accident never occurred. The record clearly establishes that the menial tasks and activities Ms. Falcon can partake in are a far cry from what they were before the accident and that her life will never be even a shadow of what it was, and what it could have become, all because of the brain injury resulting from this accident.
Considering all of the foregoing, and the entirety of the evidence in the record before us, we find the trial court did not err in granting the JNOV under the facts and circumstances of this case. Our review of the record reveals that the facts and inferences adduced at trial point so overwhelmingly in favor of awarding Ms. Falcon a much greater award in general damages than that awarded by the jury, such that reasonable persons could not arrive at a contrary finding of fact. In fact, we agree with plaintiffs assertions that the $575,000.00 in general damages awarded by the jury appears reasonable only insofar as Ms. Falcon’s physical (orthopedic) injuries. When considering the devastating effects on Ms. Falcon’s life resulting from her severe and permanent brain injury, we find reasonable persons could not have arrived at the amount awarded by the jury in general damages. Thus, the trial court applied the proper standard and did not err in concluding that the JNOV was warranted.
Furthermore, we find the trial court did hot abuse its great discretion in increasing the general damage award by $3,000,000.00. The record is replete with evidence supporting a finding that due to the pain and suffering for, not only the physical injuries, | ¡>nbut particularly for the emotional, psychological, and mental injuries, associated with the permanent brain injury, and the fact that Ms. Falcon is acutely aware of how much her life has changed by the limitations she is now bound, renders the $575,000.00 damages awarded by the jury woefully insufficient. Considering the totality of this evidence, and mindful that our role is limited to deferring to the trial court as the trier of fact, and only determining whether the amount awarded was an abuse of discretion, we conclude that this amount is supported by the record and does not constitute an abuse of the trial court’s great discretion. Assignment of error number four lacks merit. Accordingly, both the grant of the JNOV and the amount awarded must be affirmed.
CONCLUSION
For all the foregoing reasons, we find no merit to any of DOTD’s assignments of error. Accordingly, the judgment of the trial court, adopting the jury’s verdict as to liability and granting the JNOV in favor of the plaintiff, which increased Ms. Falcon’s general damage award by $3,000,000.00, is hereby affirmed. Costs of this appeal, in the amount of $8,173.81 are assessed to the Louisiana Department of Transportation and Development.
AFFIRMED.
HIGGINBOTHAM, J., concurs and assigns reasons.
McCLENDON, J., concurs in part and dissents in part and assigns reasons.
McDonald, J., agrees in part and dissents in part and assigns reasons.

. Louisiana Revised Statutes 48:461.2 provides, in pertinent part:
A. No outdoor advertising shall be erected or maintained within six hundred sixty feet of the nearest edge of the right of way and visible from the main traveled way of the interstate or primary highways in this state except the following, provided all exceptions listed below shall be in conformity with applicable federal rules and standards.
(1) Directional and other official signs and notices’, which shall include but not be limited to signs and notices pertaining to natural wonders, or scenic and historic attractions, as authorized or required by law.
(2) Signs, displays and devices advertising activities conducted on the property upon which they are located.
(3) Signs, displays and devices advertising the sale or lease of property upon which they are located.
(4) Signs, displays and devices located in areas which are zoned industrial or commercial under authority of law.
(5) Signs, displays and devices in unzoned commercial or industrial areas which areas shall be determined from actual land uses and defined by regulations to be promulgated by the department.
(6) Signs which are erected and maintained, by churches and schools, which do not in any way obstruct vision or endanger traffic.
(7)Signs which are erected and maintained by individuals which advertise the sale of seasonal agricultural products. Such signs shall be for the sale of agricultural products grown by the individual who erects and maintains the signs and the products shall be offered for sale at the location where they are grown. Such signs shall be exempt from the prohibition contained in this Subsection only for the, period of time during which the agricultural product is "in season" and shall be removed each year after the season. The department shall promulgate regulations to set standards for such signs to ensure that they are temporary and pose no danger to passing traffic.
(Emphasis added.)

. Louisiana Revised Statutes 48:347, entitled "Removal of obstacles or hazards from highway or vicinity; campaign signs,” provides, in pertinent part:
D. Notwithstanding any other provision to the contrary, political campaign signs shall not be erected, displayed, or posted within any highway right-of-way ... subject to the provisions and penalties of R.S. 30:2531 and R.S. 30:2544....

. We note that these two statutes, La. R.S. 48:461.2 and La. R.S. 48:347, are to be read in pari materia, and are not exclusive.

. We note that the trial court’s judgment granted "JNOV/additur”; however, it is dear that the judgement was granted on the main request, the JNOV, instead of the alternative request, additur. Moreover, on appeal, both parties address the judgment granting the JNOV, with no mention of additur. Accordingly, in this opinion, we address the propriety of the judgment as it granted JNOV.